2007 OK CIV APP 59

**Mary Linda McCALL, an individual, Plaintiff/Appellant,**

v.

**CHESAPEAKE ENERGY CORPORATION, an Oklahoma corporation; and Chesapeake Operating, Inc., an Oklahoma corporation, Defendants/Appellees.**

**No. 102,929.**

Court of Civil Appeals of Oklahoma, Division No. 2.

Jan. 9, 2007.

Certiorari Denied April 9, 2007.

Approved for Publication by Order of the Supreme Court April 9, 2007.

Gregory L. Mahaffey, Lee D. Groeneveld, Mahaffey & Gore, P.C., Oklahoma City, OK, for Plaintiff/Appellant.

Fred R. Gipson, Oklahoma City, OK, Robert N. Barnes, Patranell Britten Lewis, Barnes & Lewis, P.C., Oklahoma City, OK, for Defendants/Appellees.

JOHN F. FISCHER, Judge.

¶ 1 This is an appeal from the Trial Court's order granting summary judgment to a well operator in a declaratory judgment action. The appeal involves the operator's dispute with a working interest owner regarding the marketing of production from certain wells. Based on our review of the record on appeal and applicable law, we affirm.

## BACKGROUND FACTS

¶ 2 Plaintiff, Mary McCall, successor in interest to Jack O. McCall, owns non-operating working interests in four wells located in the Kirtley Unit No. 1 in Beckham County, Oklahoma. Defendant Chesapeake Operating, Inc., is the operator of the Kirtley Unit, and a wholly owned subsidiary of Defendant Chesapeake Energy Corporation (CEC).

¶ 3 Three of McCall's wells, the "Amos 1–29," the "Sharum 1A–30," and the "D.L. Sanders 1–24," are subject to joint operating agreements (the JOAs). The JOAs, based on a standard industry model form [1], are identical in their terms, but differ as to date of execution. An agreement dated July 2, 1973, applies to the Amos and Sharum wells, while one dated August 25, 1976, applies to the Sanders well. Sometime in February 1977, the JOAs for the Amos and Sharum wells were amended to include a "Gas Balancing Agreement." However, it appears that neither McCall nor her predecessor in interest ever executed those agreements. There was no gas balancing agreement applicable to the Sanders well.

¶ 4 Chesapeake Operating and Plaintiff were not subject to a JOA on her fourth well, the Staley 1–29. Chesapeake was the designated operator of the Staley well under the terms of a pooling order entered by the Oklahoma Corporation Commission (OCC).

¶ 5 In July 2004, Chesapeake Operating began corresponding with McCall regarding marketing of production from the four unit wells. By letter dated October 5, 2004, McCall's attorneys notified Chesapeake Operating of her objections to the proposed marketing arrangement and that she was electing to exercise her rights under the provisions of Oklahoma's Natural Gas Market Sharing Act (NGMSA), 52 O.S.2001 §§ 581.1 through 581.10, to market her share of production.[2] The letter further stated:

Your proposed arrangement covers areas and creates obligations broader than the obligations and rights set forth in the [NGMSA].

. . . .

It is also understood that the administrative fees are currently controlled by a schedule established from time to time by the [OCC], and that such fees are currently authorized to be deducted from proceeds. Your August 9, 2004 letter also disclosed that Chesapeake has been charging marketing fees on gas of 2% of the gross sales price and $0.20 per barrel oil prior to January 1, 2002, and after January 1, 2002, 3% of net resale price on gas and $0.30 per barrel on oil. Please advise me where same was disclosed in [McCall's] revenue statements. Also, please advise me under what authority you are charging a marketing fee on oil. The reasonableness of such fees is an issue on which [McCall] presently does not agree with Chesapeake.

¶ 6 Chesapeake Operating responded to the letter, and refused to market McCall's share of gas from the Amos, Sharum and Sanders wells under the terms of the Act. Chesapeake Operating asserted that, pursuant to paragraph 13 of the JOAs, each party was required to market its own production, and it had no obligation to market production

---

1. A.A.P.L. Form 610 Model Form Operating Agreement—1956.

2. Pursuant to section 581.10 of the NGMSA, which empowers the OCC to promulgate rules to implement the Act, the OCC has established "a procedure whereby an owner in a well may compel the well operator or other designated marketer to either sell gas on the owner's behalf or find a market for that owner's gas." Okla. Admin.Code 165:10–24–1. Under this procedure, the operator or other designated marketer "shall find an independent, non-affiliated purchaser for the electing owner's gas, or the designated marketer shall produce and sell gas for the account of the electing owner." Okla. Admin. Code 165:10–24–4(a).

on behalf of non-operating working interest owners. However, it offered to market McCall's gas under its "standard marketing agreement," once she signed it.

¶ 7 McCall declined to sign Chesapeake Operating's standard marketing agreement. On May 20, 2005, she filed an action against Chesapeake Operating and CEC seeking declaratory judgment pursuant to 12 O.S. Supp. 2004 § 1651. She requested the Trial Court to (1) determine the parties' rights and liabilities under the JOA; and (2) find that the JOA is not a marketing agreement and that she is entitled to elect to market her proportionate share of production from the Kirtley Unit through Chesapeake Operating pursuant to the provisions of the NGMSA. In their joint answer, Defendants denied that McCall had any right to elect to market her share under the terms of the NGMSA. CEC denied any contractual relationship with McCall and asserted that it was not the operator of the wells at issue.

¶ 8 Chesapeake Operating asserted a counterclaim against McCall, seeking a declaration that it had no obligation to market her production from the Amos, Sharum and Sanders wells under the NGMSA because, under the terms of section 581.4 of the NGMSA, McCall was ineligible to elect to market share from those wells. Chesapeake Operating also sought its own declaratory judgment regarding the Staley well. Chesapeake Operating conceded that McCall could elect to market her production from that well pursuant to the NGMSA. The purchaser of gas production from the Staley well was Chesapeake Energy Marketing, Inc. (CEMI).[3] For its services related to gas sales, CEMI deducted a flat 3% from the net resale price, with the working interest owner bearing its royalty owners' share of the fee. Chesapeake Operating requested the Trial Court to determine that McCall was obligated to bear her proportionate share of the marketing fees deducted by CEMI. Chesapeake Operating also requested the Trial Court to determine another issue in dispute in regard to the Staley 1–29 pooled well—the

effective date of McCall's election to market share under the Act.

¶ 9 On the same day that they filed their answer, Defendants sought summary judgment on all claims and counterclaims. McCall responded, sought summary judgment on her claims, and moved for a continuance to conduct discovery as to Chesapeake Operating's counterclaims.

¶ 10 After extensive briefing and two hearings, the Trial Court, finding no genuine dispute as to any material fact, granted summary judgment in favor of Defendants. The journal entry of judgment identifies four grounds on which the Trial Court based its determination that Defendants were entitled to judgment as a matter of law. The Trial Court determined that: (1) pursuant to section 581.4(B)(1) of the NGMSA, McCall is not eligible to market share as to those wells (the Amos 1–29, DL Sanders 1–24, and Sharum 1A–30) governed by the JOAs; (2) in regard to the Staley 1–29 pooled well, the terms of the NGMSA obligate McCall to bear her proportionate share of the 3% marketing fee deducted by CEMI, the purchaser of Chesapeake Operating's gas; (3) pursuant to section 581.5(A) of the NGMSA, McCall is not entitled to market share in the Staley 1–29 well for periods of time prior to January 1, 2005 (*i.e.*, prior to the first day of the month following 60 days from Chesapeake Operating's receipt of her written election to market share under the NGMSA); and (4) McCall failed to state a claim against CEC, the parent company of both Chesapeake and CEMI.

¶ 11 McCall appeals. She raises seven allegations of error in her petition in error, six of which can be summarized as a contention that the Trial Court erred as a matter of law in its interpretation and application of the NGMSA and the JOA terms. She also claims that the Trial Court improperly weighed the evidence regarding her claim against CEC. McCall asserts that the Trial Court's decision is erroneous, incorrectly in-

---

**3.** CEMI is a corporation formed for the purpose of purchasing gas production. It is also a wholly owned subsidiary of CEC. An affidavit that Chesapeake Operating attached to its motion for sum-

mary judgment states that Chesapeake Operating "sells its gas production from the Staley 1–29 to an affiliate purchaser—CEMI."

terprets language from the JOA, the NGMSA and OCC rules, and undermines the objectives of the NGMSA set forth in 52 O.S.2001 § 581.2.

## STANDARD OF REVIEW

¶ 12 On review of a trial court's order granting summary judgment, this Court, like the lower court, will examine the pleadings and evidentiary materials submitted by the parties to determine if there is any genuine issue of material fact. *Carmichael v. Beller,* 1996 OK 48, ¶ 2, 914 P.2d 1051, 1053. "Although a trial court in making a decision on whether summary judgment is appropriate considers factual matters, the decision turns on purely legal determinations, *i.e.,* whether one party is entitled to judgment as a matter of law because there are no disputed material factual questions." *Id.* "Therefore, as the decision involves purely legal determinations, the appellate standard of review of a trial court's grant of summary judgment is *de novo.*" *Id.* On *de novo* review, this Court exercises its independent judgment as to the legal effect of the undisputed facts disclosed by the summary judgment record. *Id.*

## DISCUSSION

I. The Amos, Sharum and Sanders Wells

¶ 13 The dispute regarding marketing of production from the three non-pooled wells centers on the interpretation and application of provisions of the NGMSA and the JOAs. McCall asserts that the Trial Court erred in determining as a matter of law that, because her interests were exempt from the provisions of the NGMSA, she could not elect under the NGMSA to have Chesapeake Operating sell gas on her behalf or find a market for her gas from these three wells. A brief review of the NGMSA and its history is necessary before considering her arguments.

¶ 14 The Oklahoma Legislature enacted the NGMSA in 1992. *See* 1992 Okla. Sess. Laws, ch. 190, §§ 18–29. This act amended

and recodified the provisions of the "Sweetheart Gas Act," while also adding several new provisions to govern gas sales.

¶ 15 The "Sweetheart Gas Act," formerly found at 52 O.S. Supp.1983 §§ 540–547, was prompted by the public policy considerations of protecting the "smaller co-owners" from predatory practices in the sale of well production. *Seal v. Corp. Comm'n,* 1986 OK 34, ¶ 7, 725 P.2d 278, 283–84. It changed the common law by entitling each owner "to share ratably in the revenues generated by the sale of production and created a type of cotenancy property interest in such proceeds." *Id.* at ¶ 16, 725 P.2d at 285.[4] It also addressed "abuses in the industry" related to delayed payment to non-selling owners:

> The Act addresses these kinds of abuses in the industry by providing for immediate balancing of all proceeds of production from a single gas well from the date of first production on and after the effective date of the Act. It gives the right of ownership of interests in a gas well ratably to each co-owner in the proceeds generated by a well's production as of the moment the gas is reduced to possession consistent with the well recognized principle of the law of capture....

*Id.* at ¶ 19, 725 P.2d at 286.

¶ 16 The Sweetheart Gas Act, however, proved to be insufficient to address the problems in the natural gas industry associated with multiple working interest owners marketing or attempting to market natural gas from the same wellbore. *See* Stephen R. McNamara & Gregory D. Miller, *Oklahoma's Production Revenue Standards Act Post FERC Order 636—Measurement, Delivery and Quantity Issues,* 29 Tulsa L.J. 639, 648 (1994). The NGMSA reflects further legislative efforts to address industry problems. *See* 52 O.S.2001 §§ 581.1 through 581.10.

¶ 17 McCall correctly states that the legislative purpose and intent of the NGMSA is to "protect the rights and correlative rights

---

4. At common law and under typical operating agreements, no such cotenancy exists. Under the language of typical operating agreements, the operator has the right, but not the obligation to market a non-operator's share of gas. The language in section 13 of the JOAs at issue herein, provides that "[e]ach party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit area...." This language is not consistent with a cotenancy relationship. *See Doheny v. Wexpro Co.,* 974 F.2d 130, 134 (10th Cir.1992).

of all owners in wells producing natural gas ... and to afford all such owners an equal opportunity to produce and market their share of gas and to receive the proceeds derived therefrom ... [and] further ... to protect such owners against discrimination in purchases in favor of one owner as against another." 52 O.S.2001 § 581.2. This is consistent with former section 541 of the Sweetheart Gas Bill. However, as noted above, the NGMSA contains provisions that were not previously part of the Sweetheart Gas Act. For example, the Legislature has identified section 581.4 of the NGMSA as a "new law," rather than "amendatory." *See* 1992 Okla. Sess. Laws, ch. 190, § 21. Section 581.4 of the NGMSA exempts certain sales from the provisions of the Act and makes certain owners ineligible to elect to market share. Section 581.4 provides, in pertinent part:

A. The following sales are exempt from the provisions of the Natural Gas Market Sharing Act:

. . . .

B. Owners in a well shall not be entitled to elect to market share pursuant to the provisions of [this Act] if in such well, such owners:

1. Are subject to a *balancing agreement or other written agreement which expressly provides for the taking, sharing, marketing or balancing of gas in a manner other than as provided for in [this Act].*

(Emphasis added.)

¶ 18 We have previously noted the absence of either the signature of McCall or her predecessor in interest on the 1977 amendments to the JOAs for the Amos and Sharum wells that added the "Gas Balancing Agreement." According to McCall's interpretation of section 581.4, application of the NGMSA is required when the operating agreement lacks "an express gas balancing agreement or other comparable contractual arrangement." McCall further claims that, in reaching its conclusion that the NGMSA did not apply, the Trial Court erroneously found that the language in paragraph 13 of the JOA satisfied the statutory requirement of an agreement "which expressly provides for the taking, sharing, marketing or balancing of gas."

According to McCall, this finding subverts the objectives of the NGMSA.

¶ 19 It is clear from the language of the administrative rules promulgated by the OCC to implement the NGMSA that a balancing agreement is not the only type of written agreement that will preclude an owner from electing to market share: "This Subchapter establishes a procedure whereby an owner in a well may compel the well operator or other designated marketer to either sell gas on the owner's behalf or find a market for that owner's gas." Okla. Admin.Code 165:10–24–1. However, "[a]n owner may not elect to market share as to a particular well if as to such well: (1) said owner is subject to a balancing agreement (or other written agreement expressly providing for gas balancing, *or the taking, sharing, marketing of gas* )." Okla. Admin. Code 10–24–3(b)(1) (emphasis added).

¶ 20 The Trial Court's decision does not subvert the objectives of the NGMSA. We note the provisions of section 581.6 of the NGMSA:

"Nothing in the [NGMSA] shall be construed to: 1. Prevent any owner from receiving the price agreed upon by contract *or to prevent any owner from taking its share of production in kind or separately disposing of its share.*"

¶ 21 A JOA is a contract and is to be interpreted according to general contract principles. *Pitco Prod. Co. v. Chaparral Energy, Inc.,* 2003 OK 5, ¶ 12, 63 P.3d 541, 544. If the language of a JOA is unambiguous, the court is to interpret it as a matter of law. *Id.* The existence of ambiguity is a determination to be made by the court. *Id.* "The mere fact the parties disagree or press for a different construction does not make an agreement ambiguous." *Id.* at ¶ 14, 63 P.3d at 544.

¶ 22 The JOAs between McCall and Chesapeake Operating are preprinted industry model forms, under the terms of which each working interest owner is obligated to "take in-kind or separately dispose of its proportionate share of the oil and gas produced from the Unit 'Area." Each JOA sets forth the "Interests of Parties" and provides terms

of the parties' ownership of production of oil and gas from the Unit Area. The JOAs further provide, at paragraph 13 (entitled "Right To Take Production in Kind"):

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others for the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and gas produced from the Unit Area. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Notwithstanding the foregoing, Operator shall not make a sale into interstate commerce of any other party's share of gas production without first giving such other party sixty (60) days notice of such intended sale.

 ¶ 23 The Amos, Sharum and Sanders wells are subject to JOAs that contain provisions governing taking, sharing and marketing of gas. McCall, as an owner in wells subject to those written agreements, is not permitted to market share pursuant to the provisions of section 581.4(B)(1). Neither the JOAs nor the NGMSA prevents her from electing to take in kind or separately dispose of her share of production, but she cannot elect to share in Chesapeake Operating's contract for the sale of production from those wells. Thus, we find that the Trial Court correctly concluded, as a matter of law that, as to those three wells, McCall was not entitled to elect to market share under the NGMSA.

## II. The Pooled Staley Well

¶ 24 As previously noted, McCall's interest in the fourth well at issue herein, the Staley 1–29, was subject to an OCC pooling order. The parties agreed that the provisions of the NGMSA applied to that well and that McCall was eligible to elect to market share. However, they disagreed as to the amount of fees that could be properly deducted from her share of production under Chesapeake's gas purchase contract with CEMI.

 ¶ 25 Section 581.10 of the NGMSA empowers the OCC to promulgate rules to implement the NGMSA and establish "a schedule of reasonable administrative fees sufficient to cover the actual costs incurred by the designated marketer to perform the duties required by the [NGMSA] and not assumed by private agreement." 52 O.S. 2001 § 581.10. In this regard, the OCC rules provide that "[t]he designated marketer [operator] may charge each electing owner with an administrative fee for marketing the electing owner's share of production." The rules further explain that "[a]dministrative fees under this Section *shall be in addition to and separate from* any and all post-production costs and expenses, *including but not limited to reasonable marketing costs* and expenses which may also be deducted from the proceeds payable to eligible electing owners." Okla. Admin. Code 165:10–24–6 (emphasis added). After reviewing the applicable statute and rules, we find no error in the Trial Court's determination that McCall was obligated to bear her proportionate share of the 3% marketing fee payable under Chesapeake Operating's contract with the purchaser of the gas, CEMI.

## III. Effective Date of Election

 ¶ 26 The Trial Court found that McCall's election to market share in the Staley well was not retroactive, and the effective date of her election was January 1, 2005. This finding is consistent with section 581.5(A), which provides that "[m]arket sharing shall become effective as to sales commencing on the first day of the month following the expiration of sixty (60) days from receipt of such election by the designated marketer." The record establishes that date is January 1, 2005, and we find no error in this regard.

## IV. Claims Against CEC

¶ 27 Finally, McCall alleged that the Chesapeake entities created, through accounting management, a structure whereby funds for marketing and operations flow to the same entity and can be managed so as to realize or eliminate profit from any particular subsidiary. McCall claims that because CEC's finances are so closely linked to those of its affiliates, any declaratory relief against Chesapeake Operating needs to be binding on its parent, CEC, and, therefore, it is a necessary party to the lawsuit.

¶ 28 We note that, in her petition, McCall made no allegations against CEC other than that Chesapeake Operating was its subsidiary.[5] "The general rule is that a corporation is a distinct legal entity separate and apart from other legal entities or stockholders." *Warner v. Hillcrest Med. Ctr.*, 1995 OK CIV APP 123, n. 5, 914 P.2d 1060, 1067 n. 5, *cert. denied, Wilkinson and Monaghan v. Hillcrest Healthcare Corp.*, 519 U.S. 861, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996) (citing *Gulf Oil Corp. v. State*, 1961 OK 71, 360 P.2d 933). Separate corporate existence will not be disregarded in the absence of proof "that the parent/subsidiary corporations [are] so closely linked and inextricably intertwined as to be effectively one entity." *Id.* at ¶ 23, 914 P.2d at 1067. McCall failed to tender evidentiary materials showing disputed issues of fact regarding whether Chesapeake Operating was the mere agent or instrumentality of CEC.[6] Indeed, the evidentiary materials of record do not establish more than "a usual parent-subsidiary relationship." *See In re Hillsborough Holdings Corp.*, 166 B.R. 461, 471 (Bankr.M.D.Fla. 1994) (recognizing that, in the corporate world, there is nothing inherently wrong in a parent managing all of the cash generated by the subsidiaries through a cash management system).

¶ 29 The evidentiary materials that McCall tendered do not demonstrate disputed material facts on this issue that require determination by the trier of fact. To the extent that the denial of relief to McCall does not moot this issue, we nonetheless find that the Trial Court did not err in refusing McCall's request to disregard the separate corporate identities of Chesapeake Operating and CEC.

## CONCLUSION

¶ 30 As a party to the JOAs for the Amos, Sharum and Sanders wells, McCall was subject to a "written agreement that expressly provides for the marketing of gas in a manner other than as provided for in [the NGMSA]." Therefore, as a matter of law, McCall was precluded from electing to market share as to those three particular wells. We conclude that the Trial Court did not err in finding that the JOAs bound the parties, to the exclusion of the provisions of the NGMSA. 52 O.S.2001 § 581.4(B)(1). With respect to the Staley well, we find no error in the Trial Court's determination that the terms of the NGMSA required McCall to bear her proportionate share of the 3% marketing fee deducted by CEMI, or that she failed to state a claim against CEC. Finally, we find no error in the Trial Court's determination that the effective date of McCall's election to market share was January 1, 2005. Accordingly, we affirm the Trial Court's grant of summary judgment to Chesapeake Operating and CEC.

¶ 31 **AFFIRMED.**

WISEMAN, P.J., and GOODMAN, J., concur.

---

**5.** Upon questioning by the Trial Court at the hearing on the parties' motions, McCall conceded that the allegations against CEC in her petition were "only as a kind of a parent and holding company of Chesapeake Operating."

**6.** "When one corporation is but an instrumentality or adjunct of another by which it is dominated and controlled, a court may look beyond the form to the substance of the situation, and disregard the theory of distinct legal entity, for the purpose of holding the dominant corporation responsible for the liabilities of the sham corporation." *Wallace v. Tulsa Yellow Cab Taxi & Baggage Co.*, 1936 OK 665, ¶ 0, 61 P.2d 645 (Syllabus 1).