2017 OK CIV APP 53

Billy J. STRACK, Trustee of the Patricia Strack Revocable Trust DTD 2/15/99 and Billy Joe Strack Revocable Trust DTD 2/15/99, and Daniela A. Renner, Sole Successor Trustee of the Paul Ariola Living Trust and the Hazel Ariola Living Trust, for themselves and all others similarly situated, Plaintiffs/Appellees,

v.

CONTINENTAL RESOURCES, INC., Defendant/Appellant.

Case Number: 114102

Court of Civil Appeals of Oklahoma, Division No. 2.

Decided: 02/08/2017

Mandate Issued: 10/27/2017

Rehearing Denied 10/27/2017

Douglas E. Burns, Terry L. Stowers, BURNS & STOWERS, P.C., Norman, Oklahoma and Kerry W. Caywood, Angela C. Jones, PARK, NELSON, CAYWOOD, JONES, LLP, for Plaintiffs/Appellees.

Jay P. Walters, GABLEGOTWALS, Oklahoma City, Oklahoma, Graydon D. Luthey, Jr., GABLEGOTWALS, Tulsa, Oklahoma and Guy S. Lipe (Pro Hac Vice), VINSON & ELKINS, LLP, Houston, Texas, for Defendant/Appellant.

JERRY L. GOODMAN, JUDGE:

¶1 Continental Resources, Inc. (Continental), appeals a June 11, 2015, order granting Billy J. Strack, Trustee of the Patricia Ann Strack Revocable Trust DTD 2/15/99 and the Billy Joe Strack Revocable Trust DTD 2/15/99, and Daniela A. Renner's, Sole Successor Trustee of the Paul Ariola Living Trust and the Hazel Ariola Living Trust (collectively "Plaintiffs"), amended motion for class action certification. Based on our review of the record and applicable law, we reverse.

### BACKGROUND

¶2 Plaintiffs are four family trusts, the Strack Trusts and Ariola Trusts (collectively, "Trusts"). The Trusts are mineral owners in Blaine County, Oklahoma, whose minerals were subject to oil and gas leases with Continental. The mineral interests were included in governmentally-sanctioned drilling and spacing units. Continental is an oil and gas company and was a working interest owner and operator that drilled and completed producing wells in such units.

¶ 3 Plaintiffs filed a petition as a putative class against Continental on November 4, 2010. Plaintiffs alleged failure to pay royalties, on all hydrocarbons, improper deductions, insufficient reporting, and failure to receive the best price.[1] Plaintiffs asserted Continental engaged in systematic schemes to misreport and skim oil and gas production and royalty proceeds from royalty owners, *inter alia*. The proposed class contained over 14,000 royalty owners in more than 1,100 wells in 35 counties in the state of Oklahoma for over 22 years.[2,3] Continental filed a motion to dismiss or to strike class allegations on October 11, 2013, which was ultimately denied. Plaintiffs filed an amended petition on November 5, 2014, adding a claim for declaratory, injunctive and/or mandamus relief, requesting Continental account for the production and proceeds attributable to the wells and to accurately inform the class of the facts on which their royalties were based.

¶ 4 On January 12, 2015, Plaintiffs filed an amended motion to certify, seeking a hybrid, issue class action under 12 O.S.2011 and Supp. 2013, 2023(B)(1) and/or (B)(2) and 2023(C)(6)(a).[4] More specifically, Plaintiffs sought certification with respect to approximately 48 legal issues, namely:

> overarching, legal-based interpretations and equitable issues which define and are applicable to [Continental's] duties, obligations and conduct *vis-à-vis* its royalty owners. These 'issues' are appropriate for disposition by the Court (not a jury) in the form of either declaratory or injunctive relief, *i.e.*, either as a 'B1 Class' or as a 'B2 Class'.

Plaintiffs further requested "Injunctive and/or Mandamus Relief," requiring Continental to account to royalty owners for all production and proceeds attributable to the wells.

¶ 5 In support of its motion, Plaintiffs contended 570.12 of the Production Revenue Standards Act (PRSA), 52 O.S.2011, 570.1 *et seq.*, provided a uniform reporting standard that Continental was mandated to comply with, including accurately informing a royalty owner of the facts on which their royalty was based. Plaintiffs asserted, however, that Continental: 1) had refused to report to royalty owners the full consideration it received for the sale of oil and gas produced from class wells; 2) engaged in a barrel-back scheme with its affiliated companies; 3) refused to disclose to royalty owners deductions for gathering, compression, dehydration, and compressor fuel where such charges were embedded within the price which Continental received from the purchase of the gas; and 4) refused to report and pay royalty on skim oil and condensate. Plaintiffs requested the court first resolve the applicable law, thereby assisting in the advancement and resolution of the action. Plaintiffs asserted the 48 issues would assist the court in determining: 1) whether further declaratory or injunctive relief would be appropriate for 2023(B)(1) or (B)(2) class certification; 2) which remaining issues or claims, including damages, should be certified for a 2023(B)(3) class; and 3) if there were any claims or issues that might require individualized treatment by the court. Finally, Plaintiffs requested the trial court issue broad, class-wide injunctive, mandamus or declaratory relief, requiring Continental to provide each putative class member a well-by-well, month-by-month statutory accounting.

¶ 6 Continental responded, objecting to Plaintiffs' request, noting no Oklahoma court had ever certified a hybrid, or issue class. Continental contended a 2023(B)(2) class was inappropriate because Plaintiffs were seeking primarily monetary damages, citing *Harvell v. Goodyear Tire and Rubber Co.*, 2006 OK 24, 164 P.3d 1028. Continental further argued Plaintiffs were seeking 48 advisory opinions on issues that did not resolve the underlying

---

1. Specifically, Plaintiffs alleged breach of contract and statutory obligations, breach of fiduciary duties, breach of duties to market, breach of duties as operator, actual fraud, deceit, constructive fraud, conversion, unjust enrichment, civil conspiracy, punitive damages, accounting, and a request for a temporary restraining order.

2. The record alternatively provides over 17,000 royalty owners.

3. Plaintiff subsequently amended the class to start July 1, 1993.

4. A hybrid class action and issue certification are discussed *infra*, pages 10-11.

claims, on issues unrelated to numerous prospective class members, and on the meaning and intent of statutes or common law without addressing specific conduct in the case. Finally, Continental contended Plaintiffs were seeking a constitutional end-run around recent developments in class action law, noting royalty owners' rights turned on the specific language in their leases and the unique facts applicable to their specific oil and gas wells. Thus, certification was improper.

¶ 7 After significant additional briefing by the parties, the trial court granted Plaintiffs' amended motion for class certification by order entered on June 11, 2015. The trial court found Plaintiffs' accounting claim was an independent and severable statutory claim that could be considered by the court for injunctive or mandamus relief as a 2023(B)(1) and (B)(2) class. The court further held it had the duty to determine the law applicable to the case. Thus, it held the 48 legal issues and interpretations of law were related to Plaintiffs' accounting claim and were proper for the court to rule upon.

¶ 8 In short, the order provides the case shall proceed as a class action certified pursuant to 12 O.S.2011 and Supp. 2013, 2023(A), 12 O.S.2011 and Supp. 2013, 2023(B)(1), 12 O.S.2011 and Supp. 2013, 2023(B)(2), and 12 O.S.2011 and Supp. 2013, 2023(C)(6) (*i.e.*, Issue Certification). The class (Class Members) was defined as:

All non-excluded persons or entities who are or were royalty owners in Oklahoma wells where Continental Resources, Inc. or any affiliate of Continental Resources, Inc., is or was the operator and/or working interest owner/lessee under oil and gas leases, or under governmentally created or sanctioned pooling of interests by the Oklahoma Corporation Commission, including forced pooling orders, drilling and spacing unit orders, enhanced production orders, field wide unit orders or orders approving unit agreements, from and after July 1, 1993. The Class Claims relate only to payment for hydrocarbons produced from the wells. The Class does not include overriding royalty owners or other owners who derive their interest solely through the oil and gas lessee.

The persons or entities excluded from the Class are agencies, departments or instrumentalities of the United States of America and the State of Oklahoma, publicly traded oil and gas exploration companies and their affiliates, and other persons or entities that Plaintiffs' counsel is, or may be prohibited from representing under Rule 1.7 of the Oklahoma Rules of Professional conduct. [*sic*]

An Order nunc pro tunc was filed on July 17, 2015, attaching Exhibit 1 which had been inadvertently omitted from the June 11, 2015, order. Continental appeals.

## STANDARD OF REVIEW

¶ 9 An order certifying a class action pursuant to 12 O.S.2011 and Supp. 2013, 2023 "shall be subject to a *de novo* standard of review by an appellate court reviewing the order." 12 O.S.2011 and Supp. 2013, 2023(C)(2); *Marshall Cty., OK. v. Homesales, Inc.*, 2014 OK 88, ¶ 6, 339 P.3d 878, 882.

## ANALYSIS

¶ 10 In Oklahoma, class actions are governed by 12 O.S.2011 and Supp. 2013, 2023, which provides, in relevant part:

A. PREREQUISITES TO A CLASS ACTION. One or more members of a class may sue or be sued as representative parties on behalf of all only if:

1. The class is so numerous that joinder of all members is impracticable;

2. There are questions of law or fact common to the class;

3. The claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4. The representative parties will fairly and adequately protect the interests of the class.

B. CLASS ACTIONS MAINTAINABLE. An action may be maintained as a class action if the prerequisites of subsection A of this section are satisfied and in addition:

1. The prosecution of separate actions by or against individual members of the class would create a risk of:

a. inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

b. adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

2. The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

3. The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

a. the interest of members of the class in individually controlling the prosecution or defense of separate actions,·

b. the extent and nature of any litigation concerning the controversy already commenced by or against members of the class,

c. the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and

d. the difficulties likely to be encountered in the management of a class action.

C. DETERMINATION BY ORDER WHETHER CLASS ACTION TO BE MAINTAINED; NOTICE; JUDGMENT; ACTIONS CONDUCTED PARTIALLY AS CLASS ACTIONS.

* * *

6. When appropriate:

a. an action may be brought or maintained as a class action with respect to particular issues, or

b. a class may be divided into subclasses and each subclass treated as a class.

The provisions of this section shall then be construed and applied accordingly.

¶ 11 A party seeking certification of a class action has the burden of satisfying all four requirements of subsection A. *Harvell*, 2006 OK 24, at 8, 164 P.3d at 1032. The requirements of subsection A are generally referred to as numerosity, commonality, typicality, and adequacy of representation. Secondly, the class action must fall within one of the three categories enumerated in 2023(B). *Id.*

¶ 12 A review of the record on appeal provides the trial court granted what it termed a hybrid, issue class certification as to an accounting claim as a 2023(B)(1) and (B)(2) class pursuant to 2023(C)(6)(a) as well as declaratory relief in the form of 48 legal and equitable issues. This is an issue of first impression in Oklahoma, as no Oklahoma court has granted a hybrid class action or applied 2023(C)(6)(a) to maintain a class action with respect to particular issues. Accordingly, we may look to federal law addressing Federal Rule of Civil Procedure 23.[5]

¶ 13 Briefly, a hybrid, or divided, class action is a term used by federal courts to describe an approach to certifying a class action containing both injunctive and monetary claims. *Certification of Hybrid Class Actions*, 7AA Fed. Prac. & Proc. Civ. 1784.1 (3d ed.). A hybrid class action commonly occurs when plaintiffs seek both injunctive and/or declaratory relief and monetary damages through certification under both a Rule 23(b)(2) and a (b)(3) class. See *e.g.*, *Stoffels v. SBC Commc'ns, Inc.*, 238 F.R.D. 446, 456 (W.D. Tex. 2006); *Lemon v. Int'l Union of Op. Eng'rs*, 216 F.3d 577 (7th Cir.2000); *Bynum v. D.C.*, 214 F.R.D. 27, 41 (D.D.C. 2003); *Allison v. Citgo Pet. Corp.*, 151 F.3d 402, 418 (5th Cir. 1998). However, as noted by the trial court in its June 11, 2015, order, a hybrid class action may also occur when a court "bifurcate[s] the litigation into liability and damage phases and then typically be-

---

5. Oklahoma's class action scheme closely parallels Rule 23 of the Federal Rules of Civil Procedure. The Oklahoma Supreme Court has found Rule 23 to be illustrative. *Harvell*, 2006 OK 24, at 26, 164 P.3d at 1037.

gin[s] by determining the defendant's liability; in so doing, courts may certify a (b)(2) class for the liability phase or determine liability using issue certification under Rule 23(c)(4). If the defendant is found liable, courts adopting this approach then decide whether to certify a (b)(3) class for money damages purposes and/or an additional (b)(2) class for final injunctive relief." *Newberg on Class Action* 4:38.

¶ 14 Issue certification has been employed by federal courts in varying ways. Some courts use it as a bifurcation mechanism, *i.e.*, courts bifurcate proceedings by first certifying an injunctive or declaratory class under Rule 23(b)(2) and Rule 23(c)(4)(A) to determine liability while leaving damage determinations to individual hearings or to a subsequent certification of a remedial class under Rule 23(b)(3). See *Brown v. City of Detroit*, 2014 WL 7074259, at *3 (E.D. Mich. Dec. 12, 2014); *Houser v. Pritzker*, 28 F.Supp.3d 222, 253 (S.D.N.Y. 2014); *Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 907 F.Supp.2d 492, 505 (S.D.N.Y. 2012). Courts have also used issue certification to certify only certain issues found common to the class. See *Mejdrech v. Met-Coil Sys.*, 319 F.3d 910, 911-912 (7th Cir. 2003); *Stoffels v. SBC Commc'ns, Inc.*, 238 F.R.D. 446 (W.D. Tex. 2006); *In re Copley Pharm., Inc.*, 158 F.R.D. 485, 488 (D. Wyo. 1994); 1 *McLaughlin on Class Actions* 4:43 (13th ed.). Notably, Rule 23(c)(4) is not a stand-alone clause. Certification pursuant to Rule 23(c)(4) is only proper if the requirements of Rule 23(a) and at least one of the categories of (b) are first met. See 7A C. Wright, A. Miller, & R. Kane, *Federal Practice & Procedure* 1790, at 590 (2005); *Cent. Wesleyan Coll. v. W.R. Grace &*

*Co.*, 6 F.3d 177, 189 (4th Cir. 1993); *In re Motor Fuel Temp. Sales Practices Litig.*, 292 F.R.D. 652, 665 (D. Kan. 2013).

## A. Accounting

¶ 15 The trial court granted certification of an accounting claim as a 2023(B)(1) and (B)(2) class pursuant to 2023(C)(6)(a). The court's order provides:

26. The Court finds the entitlement to the statutory (non-discretionary) accounting pursuant to 570.12 (and *Howell*), together with the statutory remedy of specific performance set forth in 570.14, is consistent with the "injunctive" and/or "mandamus" relief Plaintiffs are seeking (hereinafter the "Accounting").

\* \* \*

30. The Court further finds that Plaintiffs' Accounting claim is not one dependent upon the success of Plaintiffs' breach of contract or tort claims, but rather founded upon a breach of the statutory duty created by the PRSA. In other words, Plaintiffs could pursue the statutory remedy of "specific performance" for *any* violation of the PRSA, including violations of 570.12, without alleging any breach of contract or tort claim, and without seeking monetary damages.

(Emphasis in original).

¶ 16 Section 570.12 of the PRSA requires certain information be included for each property and month of sale with the payment from the sale of oil or gas.[6] *Howell v. Texaco Inc.*, 2004 OK 92, ¶ 31, 112 P.3d 1154, 1161, stated "[t]he PRSA provisions give the royalty owners a right to be accurately informed of the facts and place a legal duty on the

6. 52 O.S.2011, 570.12 provides:
A. The following information for each property and month of sale shall be included with each payment made to an interest owner from the sale of oil or gas:
1. Lease or well identification;
2. Month and year of sales included in the payment;
3. Total barrels or MCF attributed to such payment;
4. Price per barrel or MCF, including British Thermal Unit adjustment of gas sold;
5. Total amount attributed to such payment of severance and other production taxes, with the exception of windfall profit tax;

6. Net value of total sales attributed to such payment after taxes are deducted;
7. Owner's interest, expressed as a decimal, in production from the property;
8. Owner's share of the total value of sales attributed to such payment prior to any deductions;
9. Owner's share of the sales value attributed to such payment less owner's share of the production and severance taxes; and
10. A specific listing of the amount and purpose of any other deductions from the proceeds attributed to such payment due to the owner upon request by the owner.

respondents to accurately inform the plaintiffs of the facts on which the royalty payments are based." Section 570.14 provides:

C. Any owner injured in business or property by reason of any action in violation of the provisions of the Production Revenue Standards Act shall have the right to:

1. Recover actual damages so sustained; and

2. Obtain specific performance where equitable. The prevailing party in any court proceeding brought pursuant to the Production Revenue Standards Act shall be entitled to recover the costs of the suit, including but not limited to reasonable attorney and expert witness fees.

¶ 17 Plaintiffs contend they are entitled to specific performance of an accounting because Continental has admitted violating 570.12: 1) by reporting the BTU adjustment on all wells for all owners at a fictional "1000" rather than the actual BTU adjustment for periods prior to July 1, 2010; and 2) by failing to report wellhead volumes on check stubs. Continental disputes Plaintiffs' assertions.

■ ¶ 18 In considering a motion to certify a class, the trial court is not to resolve the merits of the claims or defenses asserted. *Masquat v. DaimlerChrysler Corp.*, 2008 OK 67, ¶ 10, 195 P.3d 48, 52-53 (citing *Harvell*, 2006 OK 24, at 11, 164 P.3d at 1032). Rather, "the Oklahoma Supreme Court subscribes to the modern view that a court may consider the merits [but only] insofar as they inform what individual issues might be a part of the adjudicatory process." *Masquat*, at 10, at 52-3 (citing Steven S. Gensler, *Civil Procedure: Class Certification and the Predominance Requirement under Oklahoma Section 2023(B)(3)*, 56 Okla. L.Rev. 289, 316 (2003)).

■ ¶ 19 Based on our review of the record and applicable law, there has been no legal determination that a violation of the provisions of the PRSA has occurred such that specific performance would be equitable, *i.e.*, there is a factual dispute such that liability has not been established rendering an accounting equitable at this time.

This is an action for an accounting, an equitable proceeding. As a general rule in

such an action, where the right to an accounting is placed in issue, as in this case, the burden is upon the plaintiff to prove his right to the relief sought. He must place in evidence facts which reasonably tend to prove that there is a balance due. Failing this, there is no right to an accounting, and the bill is properly dismissed.

*Dobry v. Dobry*, 1958 OK 8, 10, 324 P.2d 534, 537. Furthermore, the "long-standing rule in Oklahoma is that a plaintiff may not pursue an equitable remedy when the plaintiff has an adequate remedy at law." *Krug v. Helmerich & Payne, Inc.*, 2013 OK 104, ¶ 34, 320 P.3d 1012, 1022 (*Harvell*, 2006 OK 24, at 18, 164 P.3d at 1035). Accordingly, based on our review of the record and applicable law, Plaintiffs have not shown they are entitled to the requested accounting under the PRSA.

■ ¶ 20 Moreover, Plaintiffs cannot establish that certifying the accounting claim is appropriate under 2023(B)(1) and/or (B)(2). In order to meet the standard of 2023(B)(1)(a), Plaintiffs must establish that individual adjudications could force Continental to act in legally conflicting ways.

Under the Rule, it is not enough that separate litigation may result in inconsistent adjudications. Rather, the rule explicitly requires that such adjudication impose incompatible standards of conduct on the party opposing the class. Accordingly, the mere possibility of varying or inconsistent adjudications in which a party may prevail against a putative class member in one case and lose in a second case to another such class member, does not, standing alone, impose incompatible standards of conduct on the party in satisfaction of Rule 23(b)(1)(A). Rather, Rule 23(b)(1)(A) is satisfied only if inconsistent judgments in separate suits would place the party opposing the class in the position of being unable to comply with one judgment without violating the terms of another judgment. 5 Moore's Federal Practice, 23.41[2][a] (internal footnotes omitted).

*Hallaba v. Worldcom Network Servs. Inc.*, 196 F.R.D. 630, 643 (N.D. Okla. 2000).

¶ 21 In their brief in support of their amended motion for class certification, Plaintiffs asserted that class certification was appropriate under 2023(B)(1)(a) because "[i]ssues with regard to the interpretation of the PRSA would certainly fall within an 'incompatible standards' certification." Without more, Plaintiffs have not established that separate suits would place Continental in a position of being unable to comply with one judgment without violating the terms of another. Accordingly, the trial court erred in granting certification under 2023(B)(1)(a).

¶ 22 We further find 2023(B)(1)(b) to be inapplicable. This section applies when adjudicating the separate claims of individual royalty owners would "substantially impair or impede" the ability of other royalty owners to protect their interest. Section 2023(B)(1)(b). This includes, for example, "limited fund" cases, in which numerous persons make claims against a fund insufficient to satisfy all claims. *Amchem Prod.'s, Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). There is no indication in the record that adjudicating the separate claims of individual royalty owners would substantially impair or impede the ability of other royalty owners to protect their interest. In addition, Plaintiffs have not alleged that Continental has limited resources. Accordingly, the trial court erred in granting certification under 2023(B)(1)(b).

¶ 23 Finally, Plaintiffs are unable to establish that certification of the accounting claim was proper under 2023(B)(2). Section 2023(B)(2) provides a class may be certified if:

> The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole;

 ¶ 24 Initially, the Court notes that an accounting is an equitable remedy; it is not final injunctive or corresponding declaratory relief. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 365, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) ("The Rule does not speak of 'equitable' remedies generally but of injunctions and declaratory judgments"); 7AA Fed. Prac. & Proc. Civ. 1775 (3d ed.) ("[T]he declaration should be equivalent to an injunction.") As stated by the U.S. Supreme Court in *Duke [Dukes]*, Rule 23(b)(2) only applies "when a single injunction or declaratory judgment would provide relief to each member of the class ... [not] when each class member would be entitled to an individualized award of monetary damages." 564 U.S. at 360, 131 S.Ct. 2541 (refusing certification of equitable backpay claims).

¶ 25 Furthermore, an accounting is usually sought so that individual monetary relief may be subsequently obtained. In *Harvell*, 2006 OK 24, 164 P.3d 1028, the Oklahoma Supreme Court held that injunctive or declaratory relief must be the primary remedy requested for class members under 2023(B)(2).[7]

---

7. In *Harvell*, 2006 OK 24, at 26, 164 P.3d at 1038, the plaintiffs filed a class action lawsuit against Goodyear Tire and Rubber Co., seeking certification of a national class action of consumers from 37 states who had paid Goodyear a shop supply fee from 1998. The plaintiff alleged Goodyear set the fee at 7 percent of the labor charge with a maximum of $20.00, regardless of whether shop supplies were used. Although Goodyear initiated the policy, the individual stores purchased their own supplies, and the brand, supplier, and cost of the supplies varied from store to store. The trial court certified the case under 2023(B)(2) & (B)(3).
In addressing 2023(B)(2), the Court found Rule 23(b)(2) to be illustrative, stating:
> []the injunctive or declaratory relief must be the primary remedy requested for class members, and the defendant's behavior must be generally applicable to the class as a whole. The award of some monetary damages is not precluded by the requirement, provided that monetary relief is secondary or incidental to the primary injunctive or declaratory relief sought.
> To determine certification under subsection (2), the court considers not merely the relief sought by the plaintiffs, but whether the crux of the action is for monetary damages. Certification is improper if the merits of the claim turn on the defendant's individual dealings with each plaintiff. Certification is generally reserved for cases in which broad, class-wide injunctive or declaratory relief is necessary to address a group-wide injury such as in discrimination or civil rights suits, even though some damages may also be awarded.
> The present action is not similar to those types of actions. Even though Harvell also seeks an injunction against the continued practice of charging the fees, the crux of her class action is compensation sought for the allegedly fraud-

Similarly, in *Dukes*, the U.S. Supreme Court held that monetary claims may not be certified under Rule 23(b)(2), at least where the monetary relief is not incidental to the injunctive or declaratory relief.[8] *Dukes* was cited with approval in *Homesales*, 2014 OK 88, 339 P.3d 878.

¶ 26 In the present case, a review of the record reveals that the crux of Plaintiffs' action, including the accounting claim which seeks to determine the amount of damages due each Class Member, is primarily for monetary relief. Plaintiffs' amended petition alleges eleven counts, of which ten seek monetary damages. The counts include, *inter alia*, fraud, breach of contract and statutory obligations, unjust enrichment, conversion, as well as breach of duties as operator. Notably, Plaintiffs have alleged millions of dollars in underpayment of oil and gas royalties. In addition, Plaintiffs acknowledged in their amended motion to certify that the requested issue certification was a prelude to a potential 2023(B)(3) monetary damages claim certification. Accordingly, it is clear the crux of Plaintiffs' class action, including the accounting claim, is compensation for the underpayment of oil and gas royalties, which properly falls under 2023(B)(3). See *Homesales*, 2014 OK 88, at 12, 339 P.3d at 884 (damage claims must be brought pursuant to 2023(B)(3)).

¶ 27 Finally, the requested final injunctive relief or corresponding declaratory relief is appropriate only if it will settle "the legality of the behavior with respect to the class as a whole. . . ." *Homesales, Inc.*, 2014 OK 88, at 13, 339 P.3d at 884. Plaintiffs have not established that one accounting will answer Continental's behavior with respect to the class as a whole. See *Dukes*, 564 U.S. at 359, 131 S.Ct. 2541 (The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them"). While an "accounting," in a broad sense, could impact the entire class as a whole, in reality, each Class Member is entitled to a different, highly individualized accounting with respect to their claims, *i.e.*, whether Continental made improper deductions, made insufficient reporting on a Class Member's check stub, failed to receive the best price, or failed to pay royalties on all oil and/or gas, and if so, the extent to which a Class Member is entitled to relief. As a result, each Class Member would necessarily be entitled to a different and separate accounting.

¶ 28 For example, a review of the record provides the putative class includes 14,000 royalty owners with over 8,000 leases with a multitude of different types of royalty provi-

---

ulently charged shop supply fees. This case focuses squarely on a claim for compensatory money damages. A determination of the damages would require individualized determinations for each class member of the fees charged compared with the services rendered, to determine whether the fees did in fact correlate to the supplies used.

*Id.* at 26-28, 1037-39 (citations omitted).

8. In *Dukes*, one and a half million current and former female employees asserted they were subjected to discriminatory pay and promotion policies by Wal-Mart based on their gender in violation of Title VII of the Civil Rights Act of 1964. They sought injunctive and declaratory relief as well as backpay and punitive damages. The trial court granted plaintiffs' motion for certification under Rule 23(b)(2) and the Ninth Circuit affirmed. The U.S. Supreme Court held that backpay claims could not be certified with claims for injunctive and declaratory relief under (b)(2), either on the grounds that the injunctive claims predominated or that back-pay was equitable in nature.

The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Nagareda*, 84 N.Y.U.L.Rev., at 132. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages. . . .

Given that structure, we think it clear that individualized monetary claims belong in Rule 23(b)(3).

*Id.* at 361-62, 131 S.Ct. 2541. *See also* (Fed. R.Civ.P. 23 advisory committee's note ("[Subdivision (b)(2)] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.")).

sions governing royalty payments. Each of the types of royalty provisions will require a different inquiry to determine a Class Members' claim for underpayment of oil or gas royalties. The determination of what was actually required to be paid versus what Continental ultimately paid will be different for each Class Member depending on particular lease language. According to *Mittelstaedt v. Santa Fe Minerals, Inc.*, 1998 OK 7, ¶ 8, 954 P.2d 1203, 1205, the trial court must "fix the rights and duties of the parties according to the language of the leases and the implied covenants that go with them."

¶ 29. Additionally, the record provides there are more than 1,100 class wells located in over 35 counties in Oklahoma and that Continental sold production under more than 190 different gas purchase contracts over a period going back to 1993. Pursuant to *Mittelstaedt*, these wells located in various places, with different gas qualities and production conditions, differences in the custom and usage in the industry, as well as the various marketing arrangements under which the gas was sold, necessitates an individual inquiry of the facts of each gas sale.

■ ¶ 30 Finally, under Oklahoma law, lessees have an implied duty of marketability, *i.e.*, the lessee must bear the full cost of any services required to put gas in a marketable condition, except where a lease expressly allows deductions for the costs. *Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 Fed. Appx. 938, 940 (10th Cir. 2013) (citing *Wood v. TXO Prod. Corp.*, 1992 OK 100, 854 P.2d 880).

> [I]n some cases, a royalty interest may be burdened with post-production costs, and in other cases it may not.
>
> * * *
>
> [ ]*Post-production costs must be examined on an individual basis* to determine if they are within the class of costs shared by a royalty interest.

The lessee has duty to provide marketable product available to market at the leased premises. Generally, custom and usage in the industry are used in determining the scope of duties created by the lease. Neither the facts given us nor the legal arguments on the certified question identify custom and usage with respect to the individual costs at issue when the leases were executed.

*Mittelstaedt*, 1998 OK 7, at 2, 19-20, 954 P.2d at 23 (emphasis added). See also 52 O.S.2011, 581.1 and *McCall v. Chesapeake Energy Corp.*, 2007 OK CIV APP 59, 164 P.3d 1120.

¶ 31 The question of where and when particular gas is marketable is not settled in Oklahoma. In addition, there is no categorical rule with respect to when post-production costs may be considered for royalty valuation. *Mittelstaedt*, 1998 OK 7, at 2, 954 P.2d at 1205 ("in some cases a royalty interest may be burdened with post-production costs, and in other cases it may not"). Notably, "post-production costs must be examined on an *individual basis* to determine if they are within the class of costs shared by a royalty interest." *Id.* at 19, at 1208 (emphasis added); *Howell*, 2004 OK 92, at 20, 112 P.3d at 1160 ("the courts must carefully scrutinize the figures to determine the correct amount.").

¶ 32 As a result, highly individualized and fact-intensive review of each Class Members' claim would be necessary to determine if Continental underpaid oil or gas royalties. Thus, "[ ]certification is improper [because] the merits of the claim turn on the defendant's individual dealings with each plaintiff." *Harvell*, 2006 OK 24, at 27, 164 P.3d at 1038. Additional individualized and fact-intensive reviews of Plaintiffs' remaining claims would likewise be required. In short, Plaintiffs have not shown that issue certification, *i.e.*, issuing the requested accounting, will settle "the legality of the behavior with respect to the class as a whole...." *Homesales*, 2014 OK 88, at 13, 339 P.3d at 884.

¶ 33 Based on the foregoing reasons, the Court finds the trial court erred in granting certification of the accounting claim as a 2023(B)(1) and (B)(2) class pursuant to 2023(C)(6)(a).

**B. 48 Legal and Equitable Issues**

¶ 34 With respect to the requested declaratory relief, the Court finds the 48 "legal-based interpretations and equitable issues" merely request the court to define or even opine on the meaning, nature, or intent of

statutes or common law, without addressing Continental, a Class Member, or Continental's behavior to a specific Class Member. The issues will not resolve the inherently individualized fact specific issues regarding whether Continental failed to pay royalties on all hydrocarbons, engaged in a barrel-back scheme, failed to disclose to royalty owners deductions for gathering, compression, dehydration, compressor fuel, where such charges were embedded within the price which Continental received from a purchase of the gas, *inter alia.* For example, Issue III-A requests the trial court define a "marketable product in relation to the sale or disposition of natural gas." [9] Other questions address public policy: Issue III-F provides: "As a matter of public policy, expressed by legislative enactment effective May 8, 2012, do pooling orders entered by the Oklahoma Corporation Commission on or after May 8, 2012, contain an implied covenant to market?"

¶ 35 The declaratory relief sought by Plaintiffs is not dispositive of any claim of relief. Rather, Plaintiffs assert the trial court should first resolve what the applicable law is relating to these "core" legal issues thereby "assisting in the advancement and resolution of this action." However, the identified issues request the court issue multiple advisory opinions setting forth the legal framework for subsequent determinations of liability and potential damages. This Court does not issue advisory opinions or answer hypothetical questions. *Ball v. Wilshire Ins. Co.*, 2007 OK 80, ¶ 1 fn.3, 184 P.3d 463, 467 fn. 3 (citations omitted).

¶ 36 For these reasons, the Court finds the trial court erroneously granted Plaintiffs' amended motion for class certification. The June 11, 2015, order is therefore reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.

## CONCLUSION

¶ 37 We find the requisites for a class action have not been met and reverse the trial court's June 11, 2015, order certifying a hybrid, issue class action. The matter is therefore remanded for further proceedings consistent with this opinion.

¶ 38 **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

FISCHER, P.J., concurs and RAPP, J., concurs specially.

RAPP, J., concurring specially:

I concur and write specially to add that this Opinion does not foreclose consideration

9. Plaintiffs identified three categories of legal and equitable questions:

1. Issues Related to the Production Revenue Standards Act, 52 O.S. 570.1 *et. seq.* (PRSA), and Other Recent Legislative Enactments, Evidencing Oklahoma's Public Policy and General Rules of Conduct for the Oil and Gas Industry
2. Issues Involving [Continental] Transactions with [Continental]-Affiliated Entities
3. Issues Related to Marketable Product and the Implied Duty to Market

By way of example:

1. Issues Related to the Production Revenue Standards Act, 52 O.S. 570.1 *et seq.* (PRSA), and Other Recent Legislative Enactments, Evidencing Oklahoma's Public Policy and General Rules of Conduct for the Oil and Gas Industry
A. Are [Continental's] duties, obligations and conduct *vis-à-vis* its royalty owners subject to, and governed by, the overarching public policy and general rules of conduct as embodied within the PRSA and other related legislative enactments, *e.g.,* the Conservation Act (52 O.S. 86.1, *et. seq.*); the Oil & Gas Owners' Lien Act of 2010 (52 O.S. 549.1 *et. seq.*); and the Energy Litigation Reform Act (52 O.S. 901 *et. seq.*)?
1. Does the PRSA, as recently supplemented by the Oil & Gas Owners' Lien Act and the Energy Litigation Reform Act, represent part of a comprehensive regulatory scheme enacted by and through the police powers of the State of Oklahoma setting out the general rules of conduct for the oil and gas industry in respect of the payment of proceeds of production from oil and gas wells in Oklahoma?
2. Was the PRSA designed specifically to protect a broad societal interest in the correlative rights of the owners of that production and the proceeds and revenue therefrom?
3. Does the public policy in Oklahoma, as embodied in the PRSA provisions, apply to [Continental] and all its royalty owners in all [Continental] wells in Oklahoma, regardless of the date pooled by the Oklahoma Corporation Commission, the date the well was drilled by [Continental] or the date or terms of the underlying oil and gas leases? ...

of forming a class utilizing the provisions of 12 O.S. Supp. 2015 2023(B)(3).