Lois FOSTER, on behalf of Herself
and all others similarly
situated, Plaintiff,

v.

**MERIT ENERGY COMPANY,**
**et al., Defendant.**

No. CIV–10–758–F.

United States District Court,
W.D. Oklahoma.

Nov. 21, 2012.

654

Allan Devore, Jandra S. Jorgenson, Devore & Jorgenson PLC, Patranell Britten Lewis, Robert N. Barnes, Barnes & Lewis LLP, Oklahoma City, OK, Angela C. Jones, Kerry W. Caywood, Park Nelson Caywood & Park, Chickasha, OK, for Plaintiff.

Christopher M. Kamper, Craig R. Carver, Carver Schwarz McNab Kamper & Forbes LLC, Denver, CO, Glenn M. White, Karl F. Hirsch, Ryan J. Reaves, Mullins Hirsch & Jones PC, Oklahoma City, OK, for Defendant.

## ORDER DENYING MOTION TO STAY AND MOTION TO RECONSIDER

STEPHEN P. FRIOT, District Judge.

Two motions are before the court. The first motion is Plaintiff's Motion to Reconsider, doc. no. 80, filed on May 29, 2012. The second motion is Plaintiff's Motion to Stay, doc. no. 86, filed on June 29, 2012. Both motions have been fully briefed and numerous notices of supplemental authority have been filed.

### I.

#### Plaintiff's Motion to Stay

The court has carefully considered plaintiff's motion to stay. The court is not persuaded that proceedings in this action should be stayed. The analysis of the matter by the undersigned is aligned with Judge Heaton's reasoning, expressed in connection with a motion presenting similar considerations, in *Foster v. Apache Corp.*, CIV–10–0573–HE, W.D. Okla. *See*, order filed on July 23, 2012 (doc. no. 179 in that case).

■ Some additional comments are appropriate. Plaintiff asserts that a stay should be entered in this action so that further proceedings in this court may be informed by the disposition of two interlocutory appeals now pending with the Tenth Circuit. Those cases are *Chieftain Royalty Co. v. XTO Energy, Inc.*, Tenth Circuit case no. 12–7047 and *Roderick Revocable Trust v. XTO Energy, Inc.*, Tenth Circuit case no. 12–3176. The *Chieftain* case is an appeal from the United States District Court for the Eastern District of Oklahoma and the *Roderick* case

is an appeal from the District of Kansas. If it appeared that decisions in those cases could be anticipated within the reasonably near future, that might be one thing. However, the court's review of the dockets in the two cases in the Tenth Circuit indicates that the briefs of the appellants were only recently filed. Oral argument has been requested, and there is no indication as to whether or when the cases might be set for oral argument. Commenting on the same cases, Judge Heaton observed, in his July 23, 2012 order, that: "While it is possible that the Court of Appeals might rule in such a fashion as would impact the disposition here, the likelihood of that is not so obvious as to warrant a delay in these proceedings." *Foster v. Apache Corp.*, supra, doc. no. 179, at 1. The undersigned agrees.

■ One other matter deserves comment. In her motion to stay, plaintiff asserts that the denial of class certification in this case was premised, *inter alia*, on a finding that "there is a 'heightened standard' for class certification under Rule 23, purportedly established by *Wal–Mart v. Dukes* [131 S.Ct. 2541 (2011) ]." Motion to Stay, doc. no. 86, at 4. The court said no such thing in its May 14, 2012 order denying class certification. Likewise, plaintiff asserts that, at the certification hearing, the court "commented that *Dukes* has turned decades of class action jurisprudence on its head." Again, the court said no such thing.[1] In the court's view, the Supreme Court's decision in *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), did not, as has been variously suggested, "tighten up" or establish a "heightened standard" for class certification. All the court did in *Dukes* is remind the lower federal courts that, because class action litigation is *representative* litigation in which the unnamed class members and the defendant will all be bound by the adjudication of the representative plaintiff's claim, the existence of a common issue within the meaning of Rule 23(a) is not to be deter-

---

1. At the hearing, the court did observe, in passing, that *Dukes* "wiped out decades of case law" on the question of whether a district court, in considering class certification, could "take a peek at the merits," 8/25/11 tr. at 130, but that is a separate matter. *See*, *Dukes*, at 2252 n. 6

(noting that some lower courts had "mistakenly" concluded that the Court's decision in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), precluded "a merits inquiry" at the class certification stage).

mined at a high level of generality. *See, Dukes* at 2551, 2556–57.

The Motion to Stay is accordingly **DENIED**.

## II.

### *The Motion to Reconsider*

The motion to reconsider seeks reconsideration of the court's May 14, 2012 memorandum opinion and order on plaintiff's motion for class certification (doc. no. 77). *See, Foster v. Merit Energy Co.*, 282 F.R.D. 541 (W.D.Okla.2012) (herein: May 14 Order). For the most part, the motion to reconsider covers matters which were thoroughly addressed in the court's May 14 Order. However, a few matters set forth in the motion to reconsider do warrant attention, as set forth below.

### 1. *The "Royalty Pot" Argument.*

Plaintiff argues that:

Oklahoma law unitizes royalty in drilling and spacing units in which all of Merit's wells have been drilled, and all of the royalty owners share in the common pool of royalty proceeds (sometimes called the "royalty pot") that has been created by statute and recognized by Oklahoma case law. Thus, each royalty owner has a stake in all leases within the unit, regardless of the language contained in his own lease.

Doc. no. 80, at 2.

Plaintiff continues this argument by concluding that: "And in the end, any underpaid royalties, regardless of the lease form, are simply thrown into the "royalty pot" for distribution to all royalty owners in the unit." *Id.* at 3. Plaintiff elaborates on this argument later in her brief, *id.* at 8–10.

This "royalty pot" argument was not advanced in plaintiff's original briefing in support of class certification, but was mentioned at the class certification hearing. The implication of this argument, albeit not clearly articulated, is that the application of 52 O.S. 2011 § 570.4 to the interests of the royalty owners in plaintiff's proposed class fortifies plaintiff's case for commonality within the meaning of Rule 23(a), Fed.R.Civ.P.

Subsection (A) of § 570.4 provides that each royalty owner "shall share in all proceeds derived from the sale of gas production from a well to the extent of such owner's royalty interest in that well without regard to the identity of the producing owners during that period." The relevant portion of § 570.4(B) provides that the operator "shall thereupon pay or cause to be paid such royalty proceeds to each royalty interest owner in the well in accordance with the proportionate royalty share owned by each royalty interest owner." The effect of this legislation is to create, in situations to which it applies, a common pot for the *distribution* of royalty funds paid into the pot by the operator, on a well-by-well basis. But the application of § 570 does nothing to ameliorate the commonality problems which were addressed at some length in the May 14, Order.

Section 570.4 is part of Oklahoma's Production Revenue Standards Act, 52 O.S. § 570.1, *et seq.* As plaintiff has asserted, where the PRSA applies, the royalties attributable to a gas well go into a "pot." Thus, as Judge Russell has observed, "shorting the pot shorts everyone who shares the proceeds of the royalty pot." *Chieftain Royalty Co. v. QEP Energy Co.*, 281 F.R.D. 499, 506 (W.D.Okla.2012). Thus, in those situations where the PRSA applies, if the producer is paying less royalty than the lease requires, that loss "shorts the pot" and consequently is borne by all royalty owners who share in the pot. But by communitizing the loss resulting from underpayment of royalty, the PRSA clearly does not eliminate the necessity of addressing the individual issues that pervade the determination of liability under the individual royalty clauses. The PRSA clearly affects the accounting aspects of the distribution of funds *out of the pot.* But the flow of funds *into that pot* is still governed by the royalty clauses in the individual leases; consequently, the determination of the extent, if any, to which the pot is shorted still depends on resolution of the individual issues discussed in the court's May 14 Order. This much was recognized by plaintiff's counsel at the class certification hearing:

[By Mr. Barnes] Now, the oil and gas leases will come into play, most definitely,

because it determines how much goes into the pot from any particular lease.

If you've got one lease that allows some deductions for gathering, compression, dehydration, and that lease covers a minuscule portion of the well, then it's going to affect everyone just very, very slightly. To the extent that that lease covers a greater interest, it will affect everyone to a larger degree. The same thing with a lease of a different kind.

Certification hearing tr., at 155. Thus, for the hundreds of wells which would be involved in this case if it were to proceed as a class action, each of the "pots will have its own collection of distinct lease forms with its own resulting legal consequences. Some 'pots' could contain leases, all of which are winners; others a mix; and still others nothing but losing leases." Defendant's Response to Motion for Reconsideration, doc. no. 84, at 8.[2]

The court concludes that plaintiff's "royalty pot" argument does nothing to bolster plaintiff's case for commonality.

### 2. *Marketing Conditions.*

On p. 6 of her brief in support of her motion to reconsider, plaintiff elaborates on her previous arguments to the effect that defendant's uniform royalty payment scheme, in and of itself, mandates a finding of commonality within the meaning of Rule 23(a), regardless of lease language (and, implicitly, regardless of the marketing conditions extant for any given well). As was explained in the May 14 Order, the defendant's uniform approach to payment of royalties is only half—and perhaps not even half—of the story. *See,* May 14 Order, at 26–27.

The differences in lease language received substantial attention in the May 14 Order, at pp. 10–26, and will be discussed further, below, in the context of plaintiff's comments about Judge Russell's approach to certification in royalty cases. However, differences in marketing conditions received less attention in the May 14 Order, but are no less significant for class certification purposes.

Suggesting that the court labors under "numerous misunderstandings" of Oklahoma law, doc. no. 80, at 5, plaintiff argues that:

> Finally, this Court's reticence to certify the class because of theoretical differences in Merit's marketing conditions is wholly unsupported in the record. Under Oklahoma law it is Merit, not Plaintiff or other putative royalty class members, who has the burden to prove each of the *Mittelstaedt* factors. Merit has offered no such evidence. On the other hand, Plaintiff's experts offered extensive evidence (based on the testimony of Merit itself and other industry sources) that the low-pressure, untreated gas from Merits's wells only becomes marketable at the gas plant tailgates or gas pooling points where the monthly published index prices received by Merit are set.

Doc. no. 80, at 4–5.

 As an initial matter, the court will note that the question of which party has the burden of proof on a particular issue at trial has little, if any, impact on an analysis of the existence and significance of individualized potentially dispositive issues for class certification purposes. Thus, the allocation of burdens of proof on the merits does nothing to reduce the possibility of differing outcomes on the merits. The possibility of differing outcomes within the proposed class is what is relevant for present purposes. Secondly, plaintiff's elaboration on the law with respect to gas marketing, doc. no. 80, at 10–12, does nothing to help plaintiff to explain away the plainly apparent need, under *Mittelstaedt v. Santa Fe Minerals, Inc.,* 954 P.2d 1203 (Okla.1998), for a well-by-well evaluation of gas marketing conditions (or something very

---

**2.** Because of the communitization effect of the PRSA, a royalty owner who—because of unfavorable language in his own lease—might not have a "free-standing" claim against the producer would likely still be a member of the class as proposed by plaintiff (and entitled to share in any recovery) because, under the PRSA, the immediate source of his royalty check is the "common pot" created by § 570.4. However, as has been discussed, the royalty *pooling and payment* arrangement mandated by the PRSA has no effect at all on the calculation of the royalties that go *into the pot* in the first instance. That calculation is dependent on the language of the royalty clauses in the individual leases.

close to a well-by-well evaluation). As Judge Heaton recently wrote:

> Plaintiff's effort to supply a common question by proposing a different approach is simply inconsistent with Oklahoma law.
>
> Thus, in light of the various marketing arrangements and other factors involved here, the point at which gas becomes marketable is not a question which can be answered on a class-wide basis, at least for a class as broad as this one.

*Foster v. Apache Corporation,* 2012 WL 3568244, at *8 (W.D.Okla. August 20, 2012).[3]

Judge Heaton's conclusion is consistent with Professor Owen Anderson's analysis of gas marketing issues as expounded in an article exhaustively analyzing the law of Oklahoma and other gas producing states.

As Professor Anderson has explained:

> While sweet, dry gas is in a marketable condition (but not necessarily in a marketable location) at the wellhead, sour or water-saturated gas, depending on market realities, may not be in a marketable condition (or a marketable location) at the wellhead.

Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations be Determined Intrinsically, Theoretically, or Realistical-*

*ly?,* 37 Nat. Resources J. 611, 634 (1997) (herein: Anderson).

■ In the case at bar, the 15,000 royalty owners plaintiff seeks to represent are collecting royalties under more than 2,000 leases,[4] with dozens of royalty clauses,[5] covering more than a thousand wells.[6] Although it may be assumed that even with more than a thousand wells, there are less than a thousand separate "market realities" affecting defendant's compliance with royalty provisions and the implied covenant to market, this case still presents a wide variety of combinations of quality of gas produced, proximity of interstate pipelines, and availability and proximity of processing plants (leaving variations in lease language out of the discussion for the time being). This brings into high relief Professor Anderson's observation that:

> Of course, in many instances, gas in fact may be in a first-marketable condition at the wellhead. In other instances, gas, such as sour gas, may not be marketable until it is treated. I hesitate to offer a list of specific examples, because *the question of when a product first becomes marketable is a question of fact, not law.*

Anderson at 642 (emphasis added).[7]

Accordingly, Professor Anderson concluded that:

---

**3.** On page 5 of her brief, and again on page 8, plaintiff suggests that the court should certify some legal questions to the Supreme Court of Oklahoma. This would be a tempting alternative but for the fact that the Supreme Court of Oklahoma has taken a noticeably cautious approach to responding to certified questions in this area of Oklahoma law. On one hand, the court was willing, in *Mittelstaedt,* to respond substantively to a narrowly-framed question certified by the Tenth Circuit. *See* May 14 Order, at 8–9. On the other hand, the Supreme Court refused Judge Russell's request for guidance on a series of interrelated royalty payment issues. *See,* Order Certifying State Law Questions to the Oklahoma Supreme Court, doc. no. 118, filed February 12, 2010 in *Hill v. Marathon Oil Company,* CIV–08–0037 (W.D.Okla.) and *Hill v. Marathon Oil Company,* No. 108,098 (Okla.Sup.Ct.), Order of May 11, 2010. The Oklahoma Supreme Court's inclination to address these issues on a case-by-case basis is understandable, given the variety of royalty clauses and marketing conditions which might come into play in any one case. If the court's opinion in *Mittelstaedt* means anything, it means that the resolution of a good many, if not most, gas royalty payment issues is highly fact-

intensive. A response by the Oklahoma Supreme Court to a list of certified questions which would put to rest the uncertainties which inhere in the case at bar would amount to a treatise on Oklahoma royalty law. That is an exercise which the Supreme Court has made clear must be undertaken with the benefit of a clear focus on the lease language and marketing conditions presented in each case. As was discussed in the May 14 Order, the Supreme Court has declined to go so far as to adopt a purely status-based approach to expounding the rights and responsibilities of royalty owners and producers.

**4.** *See,* doc. no. 53, at 7, and materials there cited.

**5.** *See,* May 14 Order, at 15–21.

**6.** *See,* doc. no. 49, at 10.

**7.** Interestingly enough, the main body of Professor Anderson's article was written before the Supreme Court handed down its decision in *Mittelstaedt v. Santa Fe Minerals, Inc.,* 954 P.2d 1203 (Okla.1998). *See,* Anderson, at 692. He was somewhat critical of pre-*Mittelstaedt* Okla-

Unlike wheat, in today's gas markets, gas may be first sold at a point and in a condition that is well beyond the point and condition where it becomes a first-marketable product. And the point at which gas becomes a first-marketable product may also vary from area-to-area and perhaps from well-to-well. Thus, it may be more difficult to determine when gas first becomes marketable than when iron ore, automobiles, and wheat first become marketable.

*Id.* at 645.

If the major premise underlying the claim plaintiff seeks to prosecute as class representative is that defendant should pay the gas royalties it owes, then the minor premise consists of a combination of (i) defendant's uniform approach to payment of royalties, (ii) the dozens of royalty clauses to be found within the proposed class, and (iii) the scores or hundreds of "market realities" surrounding the production of the gas from more than a thousand wells. The court adheres to its conclusion that that combination will not fit the Rule 23 template.

### 3. *Differences in lease language, and related matters.*

Citing *Naylor Farms v. Anadarko OGC Co.,* CIV–08–0668–R (W.D.Okla.) (herein: *Naylor Farms* ), plaintiff correctly points out that Judge Russell has:

granted class certification in a royalty underpayment class action (similar to the present case), finding that the essential elements of numerosity, commonality, typicality, adequacy of representation and predominance/superiority were met. [citation omitted.] He then dealt with his concerns regarding lease language and marketing in a series of summary judgment orders that defined the issues to be addressed at trial.

Doc. no. 80, at 22.

The representative plaintiff's lease in *Naylor Farms* obligated the producer to pay a royalty:

for gas of whatsoever nature or kind (with all constituents) produced or sold or used off the leased premises, or used in the manufacture of products therefrom, 3/16 of the gross proceeds received for the gas sold, used off the leased premises, or used in the manufacture of products therefrom, but in no event more than 3/16th of the actual amount received by the lessee. . . .

*Naylor Farms,* doc. no. 76, at 1–2.

In *Naylor Farms,* the court, apparently using defendant's proposed classifications, divided the class members' royalty clauses into 15 categories (forms A through O), depending on their verbiage.[8] *See, Naylor Farms,* doc. no. 39–5. The court then proceeded to adjudicate the rights and obligations flowing from various royalty clauses. Thus, as discussed in *Naylor Farms v. Anadarko OGC Co.,* 2011 WL 7053782 (W.D.Okla. May 9, 2011), *partial reconsideration on other issues, Naylor Farms, Inc. v. Anadarko OGC Co.,* 2011 WL 7053791 (W.D.Okla. Sept. 14, 2011), the defendant sought:

a determination that under the express language of the royalty clauses of certain lease forms [Forms E, L and M] utilized by members of the royalty owner class herein, [defendant] does not have a duty to gather, dehydrate, process or compress the gas that is produced after it has been sold and delivered to . . . the gas purchaser, and thus that the lessors/royalty owners are entitled to no more than their royalty share of the amount [defendant] actually receives from [purchaser].

*Id.* at *1.

The royalty language of Forms L and M was materially indistinguishable from the royalty clause in the representative plaintiff's lease. But the royalty clause in Form E differed from the representative plaintiff's lease in that it called for payment of royalty

---

homa decisions that did not recognize factual variables affecting marketability. *Id.* at 666. He noted in his addendum, written after *Mittelstaedt* was handed down, that, in *Mittelstaedt,* "the court wisely retreated from the impression left in its prior opinions that marketability is to be determined as a matter of law." *Id.* at 693.

**8.** The representative plaintiff was a royalty owner under one lease covering one well. *Naylor Farms,* doc. no. 76, at 1; doc. no. 39, at 11. The defendant represented that the case involved 18 wells and 132 individual leases. *Id.*

on the basis of "the value of all raw gas at the mouth of the well." *Id.* The court determined that Forms L and M did not vitiate the lessee's duty to market, but that Form E—which had scant resemblance to the representative plaintiff's royalty clause—*did* vitiate any duty on the part of the lessee "to put the gas in marketable form or to bear the costs of converting the raw gas into a marketable product." *Id.* at *3.[9] Thus, the court adjudicated rights and obligations under a royalty clause that it also determined, at least implicitly, to be materially different from the representative plaintiff's royalty clause (Forms L and M being essentially identical to plaintiff's royalty clause).

■ In the case at bar, plaintiff urges that the court adopt the *Naylor Farms* approach to adjudication of the obligations of the lessee (but not, at least as to the "at the mouth of the well" form, the same substantive result). The court declines to do so.

■ In litigating the legal meaning of her own royalty clause, as class representative, plaintiff may obtain an adjudication of the meaning of the royalty clauses of unnamed class members whose royalty clauses are legally indistinguishable from hers. But

Rule 23 (to say nothing of the doctrines of Article III standing and prudential standing) does not permit plaintiff to proceed as an oil patch ombudsman, litigating the legal meaning of lease language that has not been shown to be materially indistinguishable from hers.[10] And this showing, it must be remembered, is antecedent to an adjudication of the merits of her claim: This is a matter of class certification, and, arguably, of standing.[11]

A royalty owner with a "mouth of the well" royalty clause (there are hundreds of them in this case—hundreds with and hundreds without the "raw gas" variation) would be delighted to hitch his wagon to Ms. Foster's star as a class representative—her lease has no such impediment (other than for gas used as a feedstock), but defendant would probably have a problem with that. And in light of the fact that two veteran jurists (who, between them, have practiced Oklahoma law for nearly 100 years) disagree as to the effect of that language on the implied covenant to market, it can hardly be said that leases with and without that language should be treated as legal equivalents for class certification purposes.[12]

---

**9.** Judge Leonard disagrees with Judge Russell on this point. *See, Fankhouser v. XTO Energy, Inc.,* 2012 WL 601415, *2 (W.D.Okla. Feb. 23, 2012). The language of the representative plaintiff's royalty clause does not appear in the district court record in the Fankhouser case, so it is not possible to determine whether Judge Leonard was adjudicating the meaning of the representative plaintiff's lease.

**10.** In this context, lease language that is "materially indistinguishable" is lease language that leads to the conclusion that "the establishment of the named plaintiff[']s claims necessarily establishes those of other class members." *Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Accept. Corp.,* 632 F.3d 762, 770 (1st Cir. 2011). If it is evident, on a fair reading of the Oklahoma Supreme Court's royalty cases, that (for instance) "net", does not necessarily have the same meaning as "gross," then it cannot be said with any reasonable degree of assurance (much less the degree of assurance needed to bind unnamed class members to the outcome of the litigation of the representative's claim) that "a single stroke" will adjudicate the meaning of both words as found in the various class members' royalty clauses. Plaintiff cannot seriously suggest to the court that there is no potential for differing outcomes, better or worse than she might get on the basis of her own royalty clause,

resulting from adjudication of the obligations of the lessor under a lease providing for payment of royalty on the basis of: the value of "raw gas at the mouth of the well," May 14 Order at 16, or the value of gas "free of cost of ... delivery," *id.* at 18, or "net proceeds" received "after deduction for a fair and reasonable charge for gathering, compressing and making merchantable such gas," *id.* at 19, or the proceeds "less one-eighth of Lessee's handling cost if said gas is marketed off the leased premises," *id.* at 21. An essential feature of any class certified under Rule 23 is "the class cohesion that legitimizes representative action in the first place." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). That class cohesion is what this case lacks.

**11.** The unremarkable proposition that standing and class certification are antecedent to the merits is a matter distinct from the question of which of those two issues—standing or class certification—is antecedent to the other. *See, generally, Mahon v. Ticor Title Ins. Co.,* 683 F.3d 59, 64–65 (2d Cir.2012).

**12.** Citing *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), a decision that did not involve any class certifica-

The only plaintiff before the court is the named plaintiff. To the extent that her facts are the same as the facts as to other royalty owners ("commonality") with respect to an issue within the scope of a class certification order, the adjudication of that issue on the basis of her facts amounts to a classwide adjudication of the issue. But the named plaintiff is in no position, under Rule 23 or otherwise, to seek an adjudication of the legal effect of facts that are distinct from her facts.

■■■ Plaintiff seeks in this case to leverage her facts into an "across the board" class action of the sort which earned the Supreme Court's disapproval in *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In *Falcon*, the district court permitted a single named plaintiff, who had been repeatedly passed over for promotion, to represent individuals who, like him, had been passed over, as well as individuals who (allegedly for the same discriminatory reasons) had not been hired at all. Ironically, the representative plaintiff lost in the district court on the class claim of promotion discrimination but the district court sustained the class claim of hiring discrimination. *Id.* at 159, 102 S.Ct. 2364. The Supreme Court reversed the Fifth Circuit's judgment affirming the class certification order. The representative plaintiff did not "possess the same interest and suffer the same injury" as the class members who were not hired. *Id.* at 156, 102 S.Ct. 2364 (internal quotation omitted). As the Court noted, "[c]lass relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law *applicable in the same manner to each member of the class.*" *Id.* at 155, 102 S.Ct. 2364 (emphasis added; internal quotations omitted).

In the case at bar, Ms. Foster seeks to litigate underpayment claims on behalf of those royalty owners whose leases provide for payment of "gross proceeds" and whose leases provide for payment of "net proceeds," all on the basis of her lease (the only one she has standing to litigate), which says neither. (There are other equally stark examples. *See,* May 14 Order, at 23.) The point to be made here is that it can hardly be said that her claims "turn on questions of law [13] applicable *in the same manner* to each member of the class." *Falcon, id.* (emphasis added). Thus, there is no assurance (because of the "litigious uncertainty" referred to in the May 14 Order) that "examination of all the class member's claims for relief will produce a common answer to the crucial question why was I [charged for post-production costs]." *Dukes* at 2552.[14]

tion issues, plaintiff asserts that the Supreme Court determined "in a royalty underpayment context that the named plaintiff's claims do not have to be resolved in the same way as those of the absent class members, that the same law need not be applied, and even that liability need not be found to exist for all class members." Doc. no. 80, at 15. That description has virtually no resemblance to the decision in *Shutts*. *Shutts* involved class action claims, asserted in state court in Kansas, for interest on unpaid royalties. Aside from a jurisdictional issue, the focus of the Supreme Court's decision was the question of whether the Kansas court could, consistent with the Due Process and Full Faith and Credit clauses, apply Kansas law to all claims when only a tiny percentage of the class members (and leases) had a connection with Kansas. The Court held that Kansas law could not constitutionally be applied to the claims of all of the class members. Plaintiff's assertion that, in *Shutts*, the "Supreme Court required Kansas to apply the laws of the various 11 states where Phillips' wells produced," *id.*, is equally specious. To the contrary, the Court said that: "We make no effort to determine for ourselves which law must apply to the various transactions involved in this lawsuit, and we reaffirm our observation in *Allstate* that in many situations a state court may be free to apply one of several choices of law." *Shutts,* 472 U.S. at 823, 105 S.Ct. 2965. It may be, as plaintiff represents, that, on remand, the Kansas trial court "did use the laws of numerous states," doc. no. 80, at 15 n. 22, but the Supreme Court explicitly disclaimed any choice of law determination aside from its holding that Kansas law could not constitutionally be applied to all of the class members' claims. And all of that is aside from the fact that *Shutts* involved no issues as to the propriety of class certification (in terms of commonality, predominance, or otherwise) under either Kansas law or Rule 23.

13. For instance, the application of *Mittelstaedt* and the Oklahoma Supreme Court's other gas royalty cases.

14. As to the import of the Supreme Court's decision in *Dukes*, plaintiff understandably, but in the court's view unjustifiably, quotes (doc. no. 80, at 14 n. 19) a passage from *Newberg* in which the

If the matter is viewed as a matter of predominance under Rule 23(b)(3), rather than commonality, it is apparent that:

Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about [defendant's uniform approach to royalty payment] cannot satisfy the Rule 23(b)(3) predominance standard.

*Amchem*, at 624, 117 S.Ct. 2231.

As Judge Robinson has put it:

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." [citing *Amchem*] The requirement is met if there is a common nucleus of operative facts relevant to the dispute and those common questions represent a significant aspect of the case which can be resolved for all members of the class in a single adjudication.

*Burdette v. Vigindustries, Inc.*, 2012 WL 405621, *5 (D.Kan.2012).

Contrary to the suggestion in plaintiff's motion to reconsider, the court did not, in its May 14 Order, insist that "all elements of the claims of each class member (other than the damage amount) must be the same as those of the named Plaintiff." Doc. no. 80, at 14. *See*, May 14 Order, at 4–5.

Plaintiff's problem is not an absence of total identity of facts and issues. Her problem lies in the fact that the Oklahoma Supreme Court has made it plain that lease language is relevant to the adjudication of royalty owner claims. Plaintiff seeks to represent royalty owners who present a remarkably disparate array of royalty clauses. Her

problem, consequently, is that, in seeking to litigate the legal meaning of scores of noticeably differing royalty clauses, she does not present a "common contention ... of such a nature that it is [*both*] capable of classwide resolution," *Dukes*, 131 S.Ct. at 2551, *and* "apt to drive the resolution of the litigation," *id.* (quoting from Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132 (2009)).

The Motion to Reconsider is **DENIED**.

author of that treatise asserts that the Supreme Court did not mean what it said in an oft-quoted passage in *Dukes*. Referring to the passage in *Dukes* in which the Court said that the nature of the common contention must be such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *Dukes* at 2551, *Newberg* opines that: "Though the ['one stroke' statement] could be read to mean that the common question must affect each and every class member's claim, that is likely more than the Supreme Court intended as the Court was not, in this passage, focusing on the question of whether the

common questions need apply to many or all class members." Wm. B. Rubenstein, 1 *Newberg on Class Actions* § 3:23 (5th ed., Nov. 2012 supp.). In the court's view, the Supreme Court meant *precisely* what it said in this passage. That was the point of Part II of the *Dukes* decision. And that point was repeated later in Part II, where the Court, discussing the effect of dispersed management authority for employment decisions, observed that: "A party seeking to certify a nationwide class will be unable to show that *all the employees' Title VII claims will in fact depend on the answers to common questions.*" *Dukes* at 2554 (emphasis added).