OPINION BY DEBORAH B. BARNES, PRESIDING JUDGE:
¶ 1 Defendant Strat Land Exploration Co. (Strat Land) appeals from the trial court's order granting the motion for class certification filed by Plaintiff Tony R. Whisenant (Whisenant) on behalf of himself and others similarly situated. Based on our review, we reverse and remand for further proceedings.
BACKGROUND
¶ 2 In February 2015, Whisenant filed his "Second Amended Class Action Petition" asserting "claims based upon [Strat Land's] underpayment or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells in Oklahoma[.]" Whisenant asserts he has a royalty interest in a well - in particular, the Tretbar Family 1-15 well in Beaver County, Oklahoma - "owned in part and operated by [Strat Land]." He asserts Strat Land "has operated over 100 wells which produce gas in Oklahoma and many more in which it holds a working interest," and that the members of the proposed class are "so numerous and geographically dispersed that joinder of all members is impracticable." The wells in question are all located on or adjacent to the Oklahoma Panhandle in Ellis, Harper, Beaver, and Texas Counties.
¶ 3 Whisenant asserts there are questions of law and fact common to Whisenant and the other class members, including, among others, whether "raw gas [is] in Marketable Condition at the meter run/gathering line inlet," whether "[Strat Land] ... deduct[ed]
*705 (in cash or in kind) amounts for placing the gas (and its constituents) into Marketable Condition before paying royalty to [Whisenant] and the other Class Members," whether "[Strat Land] [paid] royalty to [Whisenant] and the other Class Members for all gas constituents, such as condensate, fractionated NGLs, nitrogen, and helium, produced from their wells," and whether "[Strat Land's] uniform practice of paying royalties based on the net, instead of the gross, gas contract value constitute[d] a breach of [Strat Land's] lease obligations to [Whisenant] and the other Class Members[.]"
¶ 4 Whisenant asserts "[he] is typical of other Class Members[ ] because [Strat Land] pays royalty to [him] and other Class Members using a common method" - i.e., "[Strat Land] pays royalty based upon the net revenue [Strat Land] receives under its marketing contracts" rather than based upon the gross amount the midstream company - in particular, DCP Midstream (f/k/a Duke Energy Field Services) - receives from its sale of the gas at the interstate (or intrastate) pipeline.[1]
¶ 5 In December 2015, Whisenant filed a motion for class certification. As set forth in the trial court's order granting class certification, the proposed class consists of all royalty owners in Oklahoma wells
(a) operated by [Strat Land]; (b) marketed by Strat Land to DCP Midstream (f/k/a Duke Energy Field Services); and (c) that have produced gas and/or gas constituents (such as residue gas, natural gas liquids, helium, or condensate) from February 12, 2009 to the time Class Notice is given.
Excluded from the class are: (1) Office of Natural Resources Revenue f/k/a the Mineral Management Service (Indian tribes and the United States); (2) [Strat Land] and its employees, officers, and directors; (3) Any NYSE and NASDAQ listed company (and its subsidiaries) engaged in oil and gas exploration, gathering, processing, or marketing; and, (4) leases that contain clear and express language authorizing the deduction from royalty of "the cost incurred in processing, gathering, treating, compressing, dehydrating, transporting, and marketing, or otherwise making such gas or other substances ready for sale or use," the cost incurred in delivering, processing, compressing or otherwise making such gas merchantable," or similar clear and express language.
¶ 6 In its order granting the motion for class certification, the trial court determined the requirements under 12 O.S. Supp. 2014 § 2023 were satisfied. Among other things, the trial court determined that "generalized"
*706 evidence (in contrast to "individualized" evidence) could properly be used to prove the merits on a class-wide basis, citing to Tyson Foods, Inc. v. Bouaphakeo , --- U.S. ----, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016), and Wal-Mart Stores, Inc. v. Dukes , 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). The trial court determined Whisenant had made a prima facie showing that Strat Land paid royalties in the same manner across the board - i.e., that it paid royalties based on what it received from DCP Midstream rather than based on what DCP Midstream received for the gas at the interstate (or intrastate) pipeline inlet. The court acknowledged that in order for the proposed class - a class of approximately one thousand royalty owners throughout the United States - to win on the merits, it would have to prove that, for each of the approximately eighty-eight wells in question, Strat Land's royalty payment and cost-deduction method was improper. However, the court concluded that "predominantly generalized proof" was sufficient to determine this issue "in one stroke." The trial court stated that "the liability (and even damages) in this case will be decided entirely by a 'battle of experts,' which is a classic reason to certify a class action," citing, inter alia, Tyson .
¶ 7 From the trial court's order granting the motion for class certification, Strat Land appeals.
STANDARD OF REVIEW
¶ 8 An order a class action "shall be subject to a de novo standard of review by any appellate court reviewing the order." 12 O.S. Supp. 2014 § 2023(C)(2).[2] See also Marshall Cnty. v. Homesales, Inc. , 2014 OK 88, ¶ 8, 339 P.3d 878 ("[T]he district court's disposition of the class action issue does not ultimately determine any issues of fact. As a result, class certification resolves only a question of law and the de novo standard required by [ § 2023(C)(2) ] is appropriate for appellate review of class certification orders[.]"). "Some consideration of the merits is appropriate in a class certification, but only insofar as it informs what individual issues might be a part of the adjudicatory process." Weber v. Mobil Oil Corp. , 2010 OK 33, ¶ 13, 243 P.3d 1 (footnote omitted).
ANALYSIS
I. Prerequisites to a Class Action
¶ 9 "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Wal-Mart Stores, Inc. v. Dukes , 564 U.S. 338, 348, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) (internal quotation marks omitted) (citation omitted). "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Id. at 348-49, 131 S.Ct. 2541 (internal quotation marks omitted) (citation omitted). In Oklahoma, class actions are governed by § 2023, which, like its federal counterpart, provides, in part, as follows:
A. PREREQUISITES TO A CLASS ACTION. One or more members of a class may sue or be sued as representative parties on behalf of all only if:
1. The class is so numerous that joinder of all members is impracticable;
2. There are questions of law or fact common to the class;
3. The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
4. The representative parties will fairly and adequately protect the interests of the class.
The requirements of subsection A are generally referred to as numerosity, commonality, typicality, and adequacy of representation. Harvell v. Goodyear Tire & Rubber Co. , 2006 OK 24, ¶ 8, 164 P.3d 1028. A party seeking certification of a class action has the burden of satisfying all four requirements of *707 subsection A, as well as one of the additional requirements contained in § 2023(B).[3] Id. Pertinent to this case, § 2023(B)(3) requires predominance of common questions of law or fact to class members and superiority of class action adjudication.
¶ 10 The primary issue on appeal is whether there are common questions of law or fact. However, because the trial court certified the class action under § 2023(B)(3), "we consider [the issue of commonality] in conjunction with the court's further conclusion that common questions also predominate." EQT Prod. Co. v. Adair , 764 F.3d 347, 365 (4th Cir. 2014). This is so because when a class action is certified under section § 2023(B)(3) - the federal counterpart of which is Federal Rule of Civil Procedure 23(b)(3) - the " 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." Amchem Prod., Inc. v. Windsor , 521 U.S. 591, 609, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).[4]
¶ 11 In the present case, class certification is inappropriate because a "highly individualized" review of the facts pertaining to each of the numerous wells is necessary. Strack v. Cont'l Res., Inc. , 2017 OK CIV APP 53, ¶ 32, 405 P.3d 131, cert. denied. Determining Strat Land's liability, and the appropriate damages (if any) to be awarded, to each of the royalty owners in the proposed class is not susceptible to class-wide resolution "in one stroke."[5] As the following discussion shows, common questions of law or fact do not predominate in this case.
II. Mittelstaedt v. Santa Fe Minerals, Inc. : Oklahoma's Fact-Intensive Inquiry
¶ 12 The trial court's order states that Strat Land had a common corporate policy of not paying royalty on the gross value of the gas produced under the leases. However, the determination in Oklahoma of the moment in time when oil or gas extracted from any particular well becomes a "marketable product" and, thus, reaches its royalty-valuation point, requires a fact-intensive inquiry. Also fact intensive is the related determination of whether costs incurred after the royalty-valuation point is reached (sometimes called post-production costs) can be proportionately charged against royalties.[6] The fact that the *708 same company - Strat Land - extracted the minerals from the numerous wells in question and that they were then sold to the same midstream company does not lend any support to an inference that the royalty-valuation point or allowable deductions, if any, are all the same or even substantially similar for each particular well. The mere fact that Strat Land engaged in uniform conduct with regard to paying royalties is also insufficient to satisfy § 2023(B)(3).[7]
¶ 13 In Oklahoma, absent express language to the contrary, a lessee is generally prohibited "from deducting a proportionate share of transportation, compression, dehydration, and blending costs," but only "when such costs are associated with creating a marketable product." Mittelstaedt v. Santa Fe Minerals, Inc. , 1998 OK 7, ¶ 2, 954 P.2d 1203. The Mittelstaedt Court further stated that
the lessor must bear a proportionate share of such costs if the lessee can show (1) that the costs enhanced the value of an already marketable product, (2) that such costs are reasonable, and (3) that actual royalty revenues increased in proportion with the costs assessed against the nonworking interest. Thus, in some cases a royalty interest may be burdened with post-production costs, and in other cases it may not.
Id. ¶ 2 (footnote omitted).
¶ 14 Regarding the moment in time when a marketable product exists, the Mittelstaedt Court stated, "It is common knowledge that raw or unprocessed gas usually undergoes certain field processes necessary to create a marketable product." Id. ¶ 21. The Court did not further define the meaning of "marketable product," nor has it done so since.[8] Rather, the Court has, for good reasons, largely left the issue open to resolution on a case-by-case basis.[9] The Mittelstaedt Court stated, for example, that "field activities" necessary to create a marketable product "may include, but are not limited to, separation, dehydration, compression, and treatment to remove impurities." Id. ¶ 21. The Mittelstaedt Court also stated: "When the gas is shown by the lessee to be in a marketable form at the well the royalty owner may be charged a proportionate expense of transporting that gas to the point of purchase." Id. ¶ 18 (emphasis added). For example, in Foster v. Merit Energy Co. , 289 F.R.D. 653 (W.D. Okla. 2012), the court, in denying class certification, quoted the following explanation of Professor Owen Anderson:
While sweet, dry gas is in a marketable condition (but not necessarily in a marketable *709 location) at the wellhead, sour or water-saturated gas, depending on market realities, may not be in a marketable condition (or a marketable location) at the wellhead.
Owen L. Anderson, Royalty Valuation: Should Royalty Obligations be Determined Intrinsically, Theoretically, or Realistically? , 37 Nat. Resources J. 611, 634 (1997).
289 F.R.D. at 658.[10]
¶ 15 Thus, as articulated recently by a separate division of this Court, "highly individualized and fact-intensive review of each Class Members' claim would be necessary to determine if [the defendant] underpaid oil or gas royalties." Strack v. Cont'l Res., Inc. , 2017 OK CIV APP 53, ¶ 32, 405 P.3d 131. See also Foster v. Apache Corp. , 285 F.R.D. 632, 638 (W.D. Okla. 2012) ("While it is easy to articulate the marketable-product rule, application of it to a particular circumstance is difficult. Doing so in the class action context is even more difficult[.]" (footnote omitted) ). The Strack Court relied upon Mittelstaedt , where the Court stated that post-production costs, for example, ''must be examined on an individual basis to determine if they are within the class of costs shared by a royalty interest." Strack , 2017 OK CIV APP 53, ¶ 30, 405 P.3d 131 (quoting Mittelstaedt ). The Strack Court stated: "Pursuant to Mittelstaedt , these wells located in various places, with different gas qualities and production conditions, differences in the custom and usage in the industry, as well as the various marketing arrangements under which the gas was sold, necessitates an individual inquiry of the facts of each gas sale." Strack , ¶ 29. This statement and the following conclusion are equally applicable to the present case:[11]
The question of where and when particular gas is marketable is not settled in Oklahoma. In addition, there is no categorical rule with respect to when post-production costs may be considered for royalty valuation. Mittelstaedt , [¶ 2 ] ("in some cases a royalty interest may be burdened with post-production costs, and in other cases it may not"). Notably, "post-production costs must be examined on an individual basis to determine if they are within the class of costs shared by a royalty interest." Id . [¶ 19 ] (emphasis added); Howell , 2004 OK 92, ¶ 20, 112 P.3d at 1160 ("[T]he courts *710 must carefully scrutinize the figures to determine the correct amount.").
As a result, highly individualized and fact-intensive review of each Class Members' claim would be necessary to determine if [the defendant] underpaid oil or gas royalties. Thus, "[c]ertification is improper [because] the merits of the claim turn on the defendant's individual dealings with each plaintiff." Harvell , 2006 OK 24, ¶ 27, 164 P.3d at 1038.
Strack , ¶¶ 31-32.
III. Tyson Foods, Inc. v. Bouaphakeo, and Wal-Mart Stores, Inc. v. Dukes
¶ 16 For the reasons set forth above, Whisenant's assertion is unavailing that "[c]lass action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts and/or [Strat Land]." Also unavailing is Whisenant's assertion that "class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts." Inconsistent and varying results are likely if this case were to proceed as a class action to be determined by generalized proof. As stated by the court in Foster v. Merit Energy Co. , 289 F.R.D. 653, 658 (W.D. Okla. 2012), even assuming,
with [a large number of] wells, there are less than [that particular number of] "market realities" affecting defendant's compliance with royalty provisions and the implied covenant to market, this case still presents a wide variety of combinations of quality of gas produced, proximity of interstate pipelines, and availability and proximity of processing plants (leaving variations in lease language out of the discussion for the time being).
¶ 17 Whisenant states on appeal that "[a]ll experts agreed it was possible" that gas could "be in marketable condition at the well," but he further asserts that, according to his experts, this could not be so "under the facts of this case based on the objective, generalized facts of the gas analysis, low pressure, high water vapor content, and [midstream] gas service contracts that required midstream services to prepare the gas for the market where the 'proceeds' were obtained."[12] We disagree that determinations of the quality of gas and other facts pertinent to each well are susceptible to generalized proof.
¶ 18 In Tyson Foods, Inc. v. Bouaphakeo , --- U.S. ----, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016), the United States Supreme Court explained that
[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.
Id. at 1045 (internal quotation marks omitted) (citation omitted).[13]
¶ 19 In Tyson , the putative class consisted of employees who claimed they were inappropriately denied compensation under the Fair Labor Standards Act for the "time spent donning and doffing the required protective gear[.]" Id. at 1046. The employer argued that a determination of the time spent by each employee putting on the protective gear was "necessarily person-specific ..., making class certification improper." Id. The employees "counter[ed] that these individual inquiries are unnecessary because it can be assumed each employee donned and doffed for the same average time observed in [one expert's] sample." Id. (emphasis added).
¶ 20 The Tyson Court ultimately found in favor of the employees and allowed class certification. However, in the present case, an assumption analogous to that forwarded by the employees in Tyson - i.e., an assumption that, for each gas well within the proposed *711 class, the royalty-valuation point and deductible costs can be set at the same average point and amount - is unwarranted. The Tyson Court explained that the permissibility of an average of a representative or statistical sample "turns not on the form a proceeding takes - be it a class or individual action - but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." Id. Thus, the Tyson Court stated:
One way for [the employees] to show, then, that the sample relied upon here is a permissible method of proving classwide liability is by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action. If the sample could have sustained a reasonable jury finding as to hours worked in each employee's individual action, that sample is a permissible means of establishing the employees' hours worked in a class action.
Id. at 1046-47. The Tyson Court concluded "the representative evidence" was a permissible means of establishing the employer's liability for the length of time its employees took to put on and off the protective gear. Id. at 1047.
¶ 21 However, in the present case, a class-wide determination for the numerous wells (and approximately one-thousand royalty owners in the putative class) based either upon the variables as they exist at Tretbar Family 1-15 well in Beaver County, in which Whisenant owns a royalty interest, or on an average sampling (i.e., of gas quality, proximity of interstate pipelines, availability and proximity of processing plants, market realities, and so forth) would result in distorted and inconsistent awards to the various members of the class.[14] Indeed, such a method could result in forcing Strat Land to pay royalty owners amounts where such amounts are not owed at all pursuant to the facts specific to certain wells, and vice versa.[15] As stated by a separate division of this Court, "Under our rule of law, a judgment must be based upon evidence that establishes essential facts as probably, not merely possibly being true," and a finding of fact cannot be based on mere conjecture and speculation. Tyson Foods, Inc. v. Marez , 1996 OK CIV APP 137, ¶ 8, 931 P.2d 760 (citations omitted). Thus, under the test set forth by the United States Supreme Court - i.e., if a sample could sustain a reasonable jury finding for an individual action, that sample constitutes a permissible means of proving the merits in a class action, Tyson , 136 S.Ct. at 1047 - class certification is inappropriate in the present case involving numerous and disparate wells.
¶ 22 Indeed, consistent with the United States Supreme Court's discussion in Tyson , the present case has more in common with the circumstances presented in the earlier case of Wal-Mart Stores, Inc. v. Dukes , 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). As explained in Tyson , in Wal-Mart "the employees were not similarly situated, so none of them could have prevailed in an individual suit by relying on depositions detailing the ways in which other employees were discriminated against by their particular store managers." Tyson , 136 S.Ct. at 1040. The Tyson Court explained that, "[i]n contrast, the employees here, who worked in the same facility, did similar work, and were paid under the same policy, could have introduced [the average of the sampling] in a *712 series of individual suits." Id. In Tyson , the facts pertaining to any particular employee's donning and doffing of the protective gear could be accurately predicted, with perhaps negligible variation, based upon the time it took for a sampling of other employees to don and doff the same protective gear. In the present case, however, an analogous assumption cannot be made regarding the pertinent variables at issue for each well and, more fundamentally, regarding the respective royalty-valuation points and deductible costs. A reliance upon facts derived from other wells would be as impermissible as it would have been to determine liability in Wal-Mart based upon generalized evidence derived from other store managers. Thus, Whisenant's assertion is unavailing that class action certification is appropriate because "the case will rely on admissible expert testimony to prove class-wide liability[.]"
¶ 23 "Generally, in determining whether the predominance standard is met, a court focuses on the issue of liability, and if the liability issue is common to the class, common questions are held to predominate over individual ones." In re Farmers Med-Pay Litig. , 2010 OK CIV APP 12, ¶ 19, 229 P.3d 551 (internal quotation marks omitted) (citation omitted). Here, even assuming Strat Land paid royalties to the members of the putative class using a common method - i.e., based, as Whisenant asserts, upon the net revenue Strat Land received under its marketing contracts rather than based upon the gross amount the midstream company received from its sale of the gas at the pipeline - the establishment of this common fact fails to resolve the issue of liability, an issue which remains individual rather than common. Thus, we disagree with Whisenant's assertion that the alleged common method of payment was "either right or wrong, class-wide."
¶ 24 For all these reasons, we conclude that questions of law or fact common to the members of the class do not predominate over questions affecting only individual members, and that a class action is not superior to other available methods for the fair and efficient adjudication of the controversy. Upon our de novo review, we conclude the trial court erred in granting the motion for class certification.
CONCLUSION
¶ 25 We conclude the requisites for a class action have not been met and we therefore reverse the trial court's order granting class certification. The matter is remanded for further proceedings consistent with this opinion.
¶ 26 REVERSED AND REMANDED FOR FURTHER PROCEEDINGS .
GOODMAN, J., concurs, and RAPP, J., concurs specially.
¶ 1 I concur with the Majority's decision.
¶ 2 I write to note that the determination of the amount of payment and when payment is due on the royalty interests is an issue in the natural gas industry. This issue affects the ability to sustain a class action based on numerous individual wells spaced over a large geographic area.
¶ 3 Historically, in order to establish the quality and quantity content of the gas hydrocarbons and contaminants produced at the wellhead, the standard practice has been to measure the pressure, volumetric flow, the crude gas content, energy content, and hydrocarbon content.
¶ 4 The volume of gas as severed at the wellhead is not generally used by the producers to determine the royalty because of the unknown and precise nature of the gas pressure, hydrocarbon content, quality, and contaminants. After wellhead severance, the gas is transported via a gathering pipeline to a processing station.[1] After processing to determine the hydrocarbon qualities and impurities content at the processing station, the gas is transported to the market pipeline *713 where it is sold.[2] Separated wellhead gas and its constituents may be sold separately by the processor after processing and without lessor's knowledge, thereby reducing lessor's royalty of wellhead gas produced. The remainder of the gas after processing is then transported to a market pipeline where it receives a gross market value for the gas. In short, producer pays owner on "net" rather than "gross" thereby reducing royalty.[3]
¶ 5 The royalty reduction is often unknown to the lessor. The royalty reduction, when at the lessor's expense, could under some circumstances constitute conversion.[4] This, I believe, was part of the basis for Plaintiff's suit. However, Plaintiff's claim lacks the element of uniformity because each well generally produces a volume and content different from another. Further, its classification at the wellhead cannot generally sustain a class action due to the numerosity of wells named and the inability to obtain uniform results.
¶ 6 Thus, I believe the Majority reached the correct result.

For a recent summary of similar allegations, see McKnight v. Linn Operating, Inc. , No. CIV-10-30-R, 2016 WL 756541, at *2 (W.D. Okla. Feb. 25, 2016), where the court stated as follows:
Producers, like the Defendants herein, often enter into contracts with midstream companies which process the gas under either percentage of proceeds ("POP"), fee or keep-whole contracts. Typically, these contracts allow the midstream companies to acquire title or possession of the unprocessed and therefore unmarketable gas at the wellhead or somewhere upstream of the midstream company's processing facilities and producers then declare that a "wellhead sale" has occurred and contend that the raw gas is "marketable" at the wellhead. This is an attempt to seemingly comply with the implied duty to market. However, the midstream companies provide the services of gathering, compressing, dehydrating, treatment and processing ("GCDTP") the gas and then remitting to the producer either a percentage of what the midstream company receives from the purchaser (POP) or the amount received from the pipeline minus a fee in kind or in cash charged for performing the GCDTP services. Producers then calculate and pay royalties based on the net amounts received from the midstream companies rather than the gross amount the midstream companies receive from the pipeline sales. By calculating the royalty payments on such net amounts, the royalty owners bear the costs of transforming the raw gas into a marketable product.
Nevertheless, the McKnight Court denied the motion for class certification, finding, among other things, "that common questions of law and fact do not predominate over questions affecting[ ] only individual members."Id. at *8. See also Chieftain Royalty Co. v. XTO Energy, Inc. , 528 F. App'x 938 (10th Cir. 2013), in which the court stated: "[The plaintiff] claims [the defendant] does not itself place gas into marketable condition, but instead hires various 'mid-stream' companies who perform the necessary GCDTP services to make gas marketable," and, "[a]ccording to [the plaintiff], 'the net result ... is an effective deduction to the royalty owners for [GCDTP services]' " - "[e]ssentially, [the plaintiff] contends that royalty owners 'should be paid the gross product value, not the net value after subtraction of the service fees.' " Id. at 940-41.

Compare this standard of review with the older standard articulated, for example, in one of the Court of Civil Appeals opinions relied upon by the trial court in its order granting class certification - Greghol Limited Partnership v. Oryx Energy Company , 1998 OK CIV APP 111, 959 P.2d 596 - in which a separate division of this Court stated: "A trial court's order granting class certification is entitled to great deference." Id. ¶ 6 (citation omitted).

As summarized by the Harvell Court,
Subsection 1 through 3 of § 2023(B) requires either: 1) a risk of inconsistent adjudications by separate actions or substantial impairment of non-parties to protect their interests; 2) appropriateness of final injunctive or declaratory relief; or 3) predominance of common questions of law or fact to class members and superiority of class action adjudication.
2006 OK 24, ¶ 8, 164 P.3d 1028.

Viewed another way, the failure to satisfy one requirement is fatal to class certification, as indicated above. See Harvell , 2006 OK 24, ¶ 8, 164 P.3d 1028. Therefore, if the predominance requirement is not met, no further analysis is necessary.

We note that the appellate record of the pleadings and motions filed below spans eight volumes and over 1,800 pages (not including the expansive exhibits and transcripts provided on appeal). As stated by the trial court in its order granting class certification, Whisenant's motion for class certification
involves substantial briefing (approximately 86 pages with over 1,000 pages of exhibits in hard-copy and four DVDs containing every lease, gas contract, plant statement, and gas analysis produced in the litigation, as well as various spreadsheets summarizing the voluminous documentation), testimony from eight witnesses (Plaintiff Whisenant, Strat Land's representative Mr. McGhee, and six experts) and 59 exhibits that were presented over two days in a live hearing before the Court, which resulted in a hearing transcript of more than 520 pages.

The separate opinion in Mittelstaedt v. Santa Fe Minerals, Inc. , 1998 OK 7, 954 P.2d 1203, describes Oklahoma case law as erroneously treating marketability as a question of law. See 1998 OK 7, ¶ 15, 954 P.2d 1203 (Opala, J., dissenting in part). However, the Majority in Mittelstaedt did not describe the issue as such nor did prior cases dealing with the issue. Instead, the Mittelstaedt Court reviewed case law concerning the implied duty to market, noting that the issues involved in the cases reviewed required a fact-intensive analysis as to, for example, which costs are deductible and which are not. In this regard, see Garman v. Conoco, Inc. , 886 P.2d 652 (Colo. 1994) (cited with approval by the Majority in Mittelstaedt , ¶¶ 15-16 ), in which the Supreme Court of Colorado described the issue of whether a lessee has reasonably met its duty to market as one of fact. The Garman Court stated: "Such a determination is a question of fact to be decided based on competent evidence in the record." Id. at 661 n.28.

The following discussion in EQT Production Co. v. Adair , 764 F.3d 347 (4th Cir. 2014), is instructive:
The district court identified numerous common royalty payment practices. For example, it noted that [one of the defendants] sells all of the [coalbed methane gas (CBM) ] it produces in Virginia to an affiliate ... and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM." ....
That the defendants engaged in numerous common practices may be sufficient for commonality purposes. As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).
But the mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement. The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation. See Amchem Prods. , 521 U.S. at 623, 117 S.Ct. 2231... (noting that the predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy"). Even a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation - in this case, whether the defendants underpaid royalties. Absent such a relationship, there is no basis for concluding that individual issues will not predominate.
EQT , 764 F.3d at 366.

But see Howell v. Texaco, Inc. , 2004 OK 92, ¶¶ 17-20, 112 P.3d 1154 (The Oklahoma Supreme Court considered the question of market value of produced gas "at the wellhead" and described three ways to establish market value, but the marketability of the gas (i.e., whether a marketable product existed) "at the wellhead" was not at issue, and the defendants' claim that gas was marketable at the wellhead was not challenged by the royalty owners.).

See n.6, supra .

In the trial court's order, it is suggested that raw gas for every well either is or is not in a marketable condition at the wellhead, across the board. The court stated, for example, that if it is "true that raw gas is a marketable product at the gathering line inlet, it appears that [Strat Land] would win class-wide and all of the Midstream ... Costs would be properly deductible (though, this result seems untenable given that is the same result that would occur if Texas law were applied ...)." Interestingly, in Chieftain Royalty Co. v. XTO Energy, Inc. , 528 F. App'x 938 (10th Cir. 2013), the district court reached this same conclusion, relying upon the same expert (Daniel T. Reineke) relied upon by the trial court in the present case. On appeal in Chieftain , the Tenth Circuit Court of Appeals stated:
[T]he district court appears to have concluded that no gas is in marketable condition at the well: "The raw gas at the wellhead ... requires conditioning to eliminate or reduce the contaminants to acceptable limits to make th[e] gas marketable." ChieftainRoyalty Co. v. XTO Energy, Inc. , 2012 WL 1231837, at *1 (2012) (citing expert affidavit of Daniel T. Reineke).
Chieftain , 528 F. App'x at 941. The Tenth Circuit explained that,
under Oklahoma law, there is a possibility that some gas could be in marketable condition at the well. See Mittelstaedt , 954 P.2d 1203, 1208 ("When gas is shown by the lessee to be in marketable form at the well the royalty owner may be charged a proportionate expense of transporting that gas to the point of purchase.").
528 F. App'x at 943 (emphasis in original). The Chieftain Court vacated the district court's class certification order and remanded the case to the district court to consider various issues related to the class certification, including "whether identifying the point at which a particular stream of gas becomes marketable will require an individualized inquiry and, if so, whether that inquiry will overwhelm questions common to the class." Id. at 943 n.4.

The circumstances presented in Strack are not exactly the same as those presented here. For example, in Strack the putative class included more than 1,100 Oklahoma wells and 14,000 royalty owners. The putative class in the present case includes approximately eighty-eight Oklahoma wells and approximately 1,000 royalty owners throughout the United States. However, the precise number of wells and royalty owners pertains, more than anything, merely to the numerosity requirement for class action certification. The Strack Court also confronted various legal issues which are not presented in this case.

(Emphasis added).

In particular, the Tyson Court was concerned in this portion of its analysis with whether questions of law or fact common to class members predominate over any questions affecting only individual members. Such a predominance inquiry is also applicable to the present case, as stated further above.

Whisenant asserts "[t]he gas quality can be determined from the gas analysis, gas contracts, and plant statements already in the record and will be presented through expert testimony ... to prove or disprove whether gas reaches marketable condition at the wellhead, as Strat Land contends, or at the tailgate of the plant, as [he] contends." Whether Whisenant is here asserting that a single, unvarying class-wide determination will be imposed on all of the wells as a matter of law, or whether he is asserting the facts pertaining to each well will be individually analyzed and adjudicated, class action certification is inappropriate.

Thus, class certification would not just be unfavorable to Strat Land, but also to those potential royalty owners who would be undercompensated but bound by the class-wide determination. See, e.g., Amchem Prod., Inc. v. Windsor , 521 U.S. 591, 593, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("The dominant concern" of the class action prerequisites is that "a proposed class have sufficient unity so that absentees can fairly be bound ....").

This station is often owned by the producer. The producer generally charges a processing fee for determining produced gas volumetric content, contaminants, and hydrocarbon content. After separation, each of the separated constituents has a distinct market value. The producer then pays royalty on "net revenues" rather than gross value at the pipeline.

The processing consists in part of stripping the high end esters and selling them separately, thereby reducing the content value of the gas at market sales as well as the owners' royalty.

The ultimate result is that the gas producer and the purchasers set the amount of royalty on a basis not necessarily contemplated by the base document - the oil and gas lease.

Royalty reduction might be permissible if the Lease clearly stated where and how the final wellhead royalty value would be determined. In this case, there does not appear to be a general or uniform value for royalty reduction for each well. This could be resolved by a requirement in each individual lease for a detailed report of the wellhead pressure, volume, contaminants, and hydrocarbon content. The lease would also require a provision specifying whether royalty was based on quantity or quality, an accounting of all sales information, and royalty division.